**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| WAPP TECH LIMITED PARTNERSHIP and WAPP TECH CORP., | § § § | |
| *Plaintiffs,* | § § | Case No. 4:23-cv-01137 |
| v. | § § | JURY TRIAL DEMANDED |
| JPMORGAN CHASE BANK, N.A., | § § | |
| *Defendant.* | § § | |

---

## **WAPP'S P.R. 4-5(a) OPENING CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.   OVERVIEW OF THE PATENTED TECHNOLOGY ................................................2

III.  LEGAL STANDARDS—CLAIM CONSTRUCTION FRAMEWORK ........................3

IV.   AGREED TERMS .................................................................................................5

V.    DISPUTED TERMS FOR CONSTRUCTION.............................................................5

     A.    "simulate" / "emulate" ...........................................................................5

     B.    "application" ............................................................................................11

     C.    "system for [testing/developing] an application for a mobile device".............14

VI.   TERMS CHASE CONTENDS ARE INDEFINITE ...................................................16

     A.    "the connection simulation" ..................................................................17

     B.    "the monitored resource" ......................................................................18

     C.    "network characteristics indicative of performance of the mobile device"....21

     D.    "on the mobile device"...........................................................................24

     E.    "select one or more characteristics associated with a mobile device".............26

     F.    "the physical mobile device"..................................................................28

## TABLE OF AUTHORITIES

**Cases**

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
    512 F.3d 1338 (Fed. Cir. 2008) ...................................................................... 18, 19

*Eaton Corp. v. Rockwell Int'l Corp.*,
    323 F.3d 1332 (Fed. Cir. 2003) ........................................................................... 15

*Fisher-Price, Inc. v. Graco Children's Prods.*,
    154 F. App'x 903 (Fed. Cir. 2005) ...................................................................... 17

*GE Lighting Solutions, LLC v. AgiLight, Inc.*
    750 F.3d 1304 (Fed. Cir. 2014) ............................................................................. 4

*Golden Bridge Tech., Inc. v. Apple Inc.*
    758 F.3d 1362 (Fed. Cir. 2014) ............................................................................. 4

*In re Downing*,
    754 F. App'x 988 (Fed. Cir. 2018) .................................................................. 24, 25

*Integrated Claims Sys., LLC v. Old Glory Ins. Co.*,
    No. 2:15-cv-412-JRG, 2020 U.S. Dist. LEXIS 214425 (E.D. Tex. Nov. 17, 2020) ......... 17, 20

*Markman v. Westview Inst., Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) ................................................................................. 4

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120 (2014) ..................................................................................... 16, 24

*Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*,
    30 F.4th 1339 (Fed. Cir. 2022) ............................................................................. 16

*Pavo Sols. LLC v. Kingston Tech. Co.*,
    35 F.4th 1367 (Fed. Cir. 2022) ............................................................................. 26

*Phillips v. AWH Corp.* 415 F.3d 1303 (Fed. Cir. 2005) ....................................... 3, 4, 5

*Polaris Powerled Techs., LLC v. Samsung Elecs. Am., Inc.*,
    No. 2:22-cv-00469-JRG, 2024 U.S. Dist. LEXIS 106029 (E.D. Tex. June 14, 2024) ............. 24

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
    378 F.3d 1396 (Fed. Cir. 2004) ............................................................................... 7

*Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*,
    824 F.3d 999 (Fed. Cir. 2016) ............................................................................... 11

*Seven Networks, LLC v. Google LLC*,
    No. 2:17-CV-00442-JRG, 2018 U.S. Dist. LEXIS 220233 (E.D. Tex. July 11, 2018) ........... 22

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*,
  844 F.3d 1370 (Fed. Cir. 2017) ............................................................. 16

*Sorrell Holdings, LLC v. Infinity Headwear & Apparel, LLC*,
  No. 2022-1964, 2024 U.S. App. LEXIS 2487 (Fed. Cir. Feb. 5, 2024) .................................. 13

*Teleflex, Inc. v. Ficosa N. Am. Corp.*
  299 F.3d 1313 (Fed. Cir. 2002) ............................................................. 4

*Thorner v. Sony Comput. Entm't Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012) ............................................................. 6

*TomTom, Inc. v. Adolph*,
  790 F.3d 1315 (Fed. Cir. 2015) ....................................................... 15, 16

*Vitronics Corp. v. Conceptronic, Inc.*
  90 F.3d 1576 (Fed. Cir. 1996) ............................................................ 4, 5

*Wapp Tech et al. v. Seattle Spinco et al.*,
  No. 4:18-cv-00469-ALM (E.D. Tex. Apr. 27, 2020) .......................................... passim

*Wapp Tech et al. v. Wells Fargo & Co.*,
  No. 4:21-cv-00671-ALM (E.D. Tex. July 6, 2022) ................................... 6, 15, 21, 27

## TABLE OF EXHIBITS

| Ex. No. | Description |
|---|---|
| 1 | U.S. Patent No. 8,924,192 |
| 2 | U.S. Patent No. 9,298,864 |
| 3 | U.S. Patent No. 9,971,678 |
| 4 | U.S. Patent No. 10,353,811 |
| 5 | U.S. Patent No. 10,691,579 |
| 6 | *Wapp Tech et al. v. Seattle Spinco et al.,* No. 4:18-cv-00469-ALM, Dkt 176 |
| 7 | *Wapp Tech et al. v. Wells Fargo & Co.,* No. 4:21-cv-00671-ALM, Dkt 96 |
| 8 | Plaintiffs' expert, Sam Malek, PH. D., declaration regarding Claim Construction |
| 9 | Defendant's expert, Daniel van der Weide, PH. D., declaration regarding Claim Construction |
| 10 | Wiley Electrical and Electronics Engineering Dictionary, definition of emulator and simulate |
| 11 | Modern Dictionary of Electronics, 7th Edition, definition of simulate and emulate |
| 12 | 60/689,101 Provisional Application |
| 13 | Defendant's Invalidity Contentions Pursuant to P.R. 3-3 and 3-4 |

## I.     INTRODUCTION

Plaintiffs Wapp Tech Limited Partnership and Wapp Tech Corp. (together, "Wapp") respectfully submit this Opening Claim Construction Brief. At issue is the proper construction of nine sets of terms proposed by Chase for U.S. Patent Nos. 8,924,192 (the "'192 Patent"); 9,298,864 (the "'864 Patent"); 9,971,678 (the "'678 Patent"); 10,353,811 (the "'811 Patent"); and 10,691,579 (the "'579 Patent") (collectively the "patents-in-suit"). Exs. 1-5.

Out of nine sets of disputed claim terms, Chase argues six are invalid as indefinite, a proposition Chase must prove by clear and convincing evidence. This is a burden Chase cannot carry, in part, because Wapp and its expert have shown the meanings of these terms were clear to skilled artisans at the time of the invention in light of both the intrinsic and extrinsic record.

Chase's proposed constructions for two sets of terms—"simulate/emulate" and "application"—improperly attempt to limit their ordinary meanings to example embodiments in the specification. Chase does not allege disclaimer or lexicography as it must do to deviate from the ordinary meanings, and Chase's constructions are at odds with other disclosed embodiments and the claim language itself. Limiting claim terms to exemplary embodiments, while excluding other embodiments, is textbook legal error. The Court should give these terms their ordinary meanings instead, which it already did with respect to "simulate/emulate" in the prior *Micro Focus* case, where the Court found those two terms to be interchangeable.

Chase also argues the preambles of three claims are non-limiting, but this is wrong because each preamble provides antecedent basis for multiple claim terms and each recites essential structure that gives meaning and vitality to the claims. It is not surprising, therefore, that the Court in the *Micro Focus* case and all parties in all three prior litigations involving these patents agreed these preambles are limiting, which is the only legally correct conclusion.

## II.    OVERVIEW OF THE PATENTED TECHNOLOGY

The patents-in-suit are all within the same patent family and relate back to U.S. Patent No 7,813,910 (which is not asserted in this case). The '192, '678, and '811 Patents are continuations of the '910 Patent and generally share the same specification. The '864 and '579 Patents are divisions of a continuation-in-part (U.S. Patent No. 8,589,140) of the '910 Patent. As such, they include essentially the same specification as the '192, '678, and '811 Patent continuations. The '678, '811, '864, and '579 Patents incorporate the '192 Patent specification. *See* '678 Patent at 1:8-18; '811 Patent at 1:7-19; '864 Patent at 1:7-14; '579 Patent at 1:7-16. Thus, the citations herein are typically to the '192 Patent specification for simplicity.

The patents-in-suit are generally directed to the development and testing of applications for use on mobile devices, such as phones and tablets, which are often referred to as mobile applications. Although typically developed on a computer, the applications are designed to run on a variety of mobile devices. *See* '192 Patent at 1:52-54. Thus, proper testing seeks to ensure that the applications run correctly on many different mobile devices. *See id.* at 1:58-61.

The patents-in-suit provide solutions that allow mobile application developers to create applications that will efficiently run on a variety of mobile devices. In particular, the patents disclose a solution that emulates or simulates the hardware characteristics of different mobile devices so that developers or testers can verify proper operation of their mobile applications within an emulated or simulated mobile device environment. *See, e.g.*, *id.* at 2:12-34; *id.* at 5:55-6:9 (examples of mobile device characteristics that can be emulated/simulated). In addition, the patents-in-suit provide that the developers and testers can use actual physical devices to verify proper operation of the mobile applications. *See id.* at 5:9-12; 6:65-7:3; 10:26-29.

Another problem regarding mobile application development and testing that is recognized and addressed by the patents-in-suit relates to the networked nature of mobile applications. *See id.* at 2:4-8. Many mobile applications rely on a network (*e.g.*, cellular network) to communicate with servers and perform their respective functions. As such, a poorly performing network can significantly impact the performance of the mobile application on a mobile device. To address this problem, the patents-in-suit disclose the simulation/emulation of network characteristics indicative of different network conditions. *See, e.g.*, *id.* at 10:15-25; *id.* at 11:5-11. Using this approach, a mobile application developer or tester can verify the functionality of a mobile application within a simulated/emulated network environment that mirrors real-world network conditions that may be encountered by users of mobile devices. For instance, the mobile application developer or tester can simulate poor network conditions (*e.g.*, high latency, high pack-loss, low bandwidth availability) to verify that the mobile application performs appropriately in such conditions. *See id.* at 12:3-10.

The ability to simulate or emulate the hardware characteristics of a variety of mobile devices as well as the network characteristics of different real-world networks occurs within a software authoring environment. *See, e.g.*, *id.* at 2:21-22; 5:21-25. That environment includes a visual user interface that allows the mobile application developer or tester to interact with the software tool. *See, e.g.*, *id.* at 13:46-52. For example, a developer can write code for the mobile applications through an interface and test operations can be performed through the interface. *See, e.g.*, *id.* at 9:46-53; 10:15-25.

## III.    LEGAL STANDARDS—CLAIM CONSTRUCTION FRAMEWORK

Patents are presumed to be written for a "person of skill in the art" ("POSITA"). *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*). The general rule is that claims are

given their plain and ordinary meanings as understood by a POSITA. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004). There are "only two exceptions to [the] general rule" of plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014). To change the ordinary meaning of a claim term, the definition or disavowal must be "clear" and "unmistakable." *See GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014).

Courts consider "'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Phillips*, 415 F.3d at 1314 (quoting *Innova*, 381 F.3d at 1116). "The claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002); *Phillips*, 415 F.3d at 1314-15. The specification is another informative source: "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Finally, the patent's prosecution history "provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317.

Courts may also consider extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman v. Westview Inst., Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995). The Federal Circuit has warned against giving extrinsic evidence too much weight, and courts are prohibited

4

from relying on extrinsic evidence that contradicts the intrinsic evidence. *Vitronics*, 90 F.3d at 1584 ("Only if there were still some genuine ambiguity in the claims, after consideration of all available intrinsic evidence, should the trial court have resorted to extrinsic evidence, such as expert testimony, in order to construe claim 1."); *see also Phillips*, 415 F.3d at 1317-18.

## IV.    AGREED TERMS

The parties have agreed to constructions for five terms, as set forth in the P.R. 4-3 joint claim construction statement. *See* Dkt. 45 at 2. Wapp respectfully requests the Court adopt those constructions.

## V.    DISPUTED TERMS FOR CONSTRUCTION

### A.  "simulate" / "emulate"

| Terms/Claims | Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| **"simulate"**<br><br>'192 Pat. Cls. 1, 12-13<br>'864 Pat. Cl. 1<br>'678 Pat. Cls. 1, 3<br>'811 Pat. Cls. 1, 8, 22, 24<br>'579 Pat. Cls. 19-20, 33 | "emulate" | "represent features of"; different than emulate |
| **"emulate"**<br><br>'192 Patent Cls. 1, 60<br>'811 Patent Cl. 26 | Plain meaning | '192 Patent: "model the hardware of"<br><br>'811 Patent: "model the hardware" |

"Simulate" and "emulate" are interchangeable terms in the context of the patents-in-suit, and both terms should be given the same plain and ordinary meaning. In the *Micro Focus* case, this Court construed these terms exactly as Wapp proposes here and held "the patentee used the terms 'simulate' and 'emulate' interchangeably." *Micro Focus* Order[1] at 25. This Court's correct

---

[1] "*Micro Focus* Order" refers to this Court's claim construction order in *Wapp Tech et al. v. Seattle Spinco et al.*, No. 4:18-cv-00469-ALM, Dkt. 176 (E.D. Tex. Apr. 27, 2020), attached as Ex. 6.

conclusion was supported by both intrinsic and extrinsic evidence. *Id.* at 21 ("The specification is consistent with this understanding of interchangeable use"); *id.* at 22 ("even the extrinsic evidence submitted by Defendants is consistent with finding that the terms 'simulate' and 'emulate' can be used interchangeably"). In the subsequent cases against Wells Fargo and Bank of America, all parties agreed with the Court's interchangeable constructions for "simulate" and "emulate" and the Court adopted the same constructions again. Bank Case Order[2] at 8; *see also* Malek Dec.[3] ¶¶53-59 (analyzing and agreeing with this Court's prior constructions).

Chase improperly asks the Court to limit the meanings of these terms to example embodiments, even though Chase does not allege disclaimer or express definition. This is legal error—disclaimer and definition are the "***only two exceptions***" to the "general rule" that claim terms are given their plain and ordinary meanings. *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)[4]. Chase's faulty arguments mirror the prior defendants' arguments that this Court rejected in the *Micro Focus* case, often nearly verbatim. *Compare, e.g.*, Chase Dec.[5] at ¶107 ("the emulator models hardware (of a mobile device), and the simulator represents features (of a network)") *with Micro Focus* Order at 24 (rejecting defendants' argument that "the specification uses 'emulate' with reference to representing a mobile device and uses 'simulate' with reference to representing a communication network").

---

[2] "Bank Case Order" refers to this Court's claim construction order in the *Wells Fargo* and *Bank of America* Cases. *Wapp Tech et al. v. Wells Fargo & Co.*, No. 4:21-cv-00671-ALM, Dkt. 96 (E.D. Tex. July 6, 2022), attached as Ex. 7.

[3] "Malek Dec." refers to the Declaration of Dr. Sam Malek Regarding Claim Construction, attached as Ex. 8.

[4] All emphasis added except where otherwise indicated.

[5] "Chase Dec." refers to the Declaration of Daniel van der Weide Regarding Claim Construction, attached as Ex. 9.

The claim language supports Wapp's constructions. As Dr. Malek explains, "the claims themselves use the terms 'simulate' and 'emulate' interchangeably, and the meaning of the terms is clear from the context of their use." Malek Dec. ¶31. For example, '192 Patent claim 1 recites both *emulating* a plurality of network characteristics and *simulating* a network connection state, *i.e.*, the claim uses both "simulate" and "emulate" interchangeably to describe the relationship between the "software authoring interface" and the simulated/emulated "network":

> 1. A system for developing an application for a mobile device comprising:
>
> a software authoring interface configured to simultaneously visually **emulate**, via one or more profile display windows, **a plurality of network characteristics** indicative of performance of the mobile device when executing the application; wherein the software authoring interface is further configured to **simulate a network connection state** encountered by the mobile device.

'192 Patent claim 1. Similarly, claim 16 (which depends from claim 1) also recites "emulat[ing] network characteristics," demonstrating that the word choice in claim 1 was not an unusual usage of "emulate." This Court previously recognized this interchangeable use of "simulate" and "emulate" in the '192 Patent's claims and noted "where neither the plain meaning nor the patent itself commands a difference in scope between two terms, they may be construed identically." *Micro Focus* Order at 20 (quoting *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004)). The same interchangeability can be seen when comparing '678 claim 16 with '192 claim 16. The two claims are almost identical except one recites "***emulating*** network characteristics" while the other recites "***simulating*** network characteristics." Malek Dec. ¶35.

These interchangeable uses of "emulate" and "simulate" in claims 1 and 16 of the '192 Patent and claim 16 of the '678 Patent dispositively show Chase's proposed constructions are wrong. Chase's constructions limit "emulate" to "hardware," and Chase's expert opines that the

7

emulator does **not** model network characteristics: "the capabilities of the mobile device *emulator* and the network *simulator* remain distinct: the emulator models hardware (of a mobile device), and the simulator represents features (of a network)." Chase Dec. ¶107. The above claims directly contradict Chase's position because they repeatedly recite "emulat[ing] … network characteristics" and because they use "simulate" and "emulate" interchangeably in relation to the "network." Moreover, this Court has already rejected the argument that "emulate" relates to the mobile device hardware and "simulate" relates to the network. *Micro Focus* Order at 24.

Chase's only response to the '192 claim language is to argue the patentee's repeated inclusion of "emulate" was an "editing error" during prosecution. Chase Dec. ¶59. The Court has already rejected this exact argument. *Micro Focus* Order at 24-25 (rejecting defendants' argument "that the patentee mistakenly failed to change 'emulate' to 'simulate' when the patentee amended this claim"); Malek Dec. ¶52 ("a POSITA reviewing the file history would not have understood the change to 'emulate…network characteristics' to have been a mistake").

The claim language of the '864 Patent also supports Wapp's constructions and directly refutes Chase's. Claim 9 of the '864 recites "defining one or more virtual users to **simulate real users**." Claim 10, which depends from claim 9, recites "the one or more virtual users **emulate actions of real user behavior**." Claim 11, which depends from claim 10, also recites "**emulate real user behavior**." This is yet another example of "simulate" and "emulate" being used interchangeably in the claims, this time in relation to the behavior of "real users."

Chase's expert nonsensically believes "real user behavior" refers to hardware. *See, e.g.*, Chase Dec. ¶96 (opining that "real user behavior" refers to "how the hardware of a mobile device would respond to that behavior"). If Chase's interpretation were correct, then it would not make sense to claim "simulate real users" because in Chase's incorrect view "simulate" does not relate

to hardware, only "emulate" does. The fact that the '864 Patent uses these terms interchangeably in relation to the behavior of "real users" is inconsistent with Chase's view of these terms and demonstrates the incorrectness of its proposed constructions.

The specification also uses "simulate" and "emulate" interchangeably. For example, the Wapp Patents refer to both "*emulat[ing]* network characteristics" and "network characteristics for *simulation* by *simulator*." '192 Patent at 2:6-7, 13:9-10. The specification also discloses "*emulator* 101 may download additional model data 820 for use within device model 102 for increasing *simulated* functionality of model 102 (e.g., *simulating additional handset functionality and/or network functionality*)." '192 Patent at 10:58-62. This interchangeable use confirms that both emulating and simulating can include (but are not limited to) emulation/simulation of handset functionality or network functionality. It also confirms that neither term is limited to "hardware," as Chase wrongly argues for "emulate." Malek Dec. ¶41.

The specification also discloses embodiments where a simulator operates within an emulator. "In this embodiment, *simulator* 810 may operate within *emulator* 101." '192 Patent at 13:20-21. "*[E]mulator* 101 interacts with one or more operator development servers … to configure device model 102 for *simulated* network operation to allow testing of application 104 within a *simulated* wireless network environment." *Id.* at 10:18-22. And Figure 8 shows an "emulator" than contains a "simulator" inside of it:

9



Fig. 8. These disclosures show that the concept of an emulator must be broad enough to encompass a simulator. Malek Dec. ¶46. Chase's constructions that limit "emulate" to hardware, but do not so limit "simulate," contradict these disclosures. If an emulator comprises a simulator, then the emulator necessarily has all the capabilities of the simulator. If the simulator is not limited to hardware, then the emulator that comprises it cannot be limited to hardware either. Similarly, Chase's argument that the simulator relates to network characteristics, but the emulator does not, makes no sense in light of these disclosures. The specification states the emulator can contain a "network simulator" or a "simulated wireless network environment." '192 at Fig 8; 8:41-49. Because the simulator is capable of simulating network characteristics, the emulator that comprises it must also be capable of doing this.

The extrinsic evidence also shows that "simulate" and "emulate" are interchangeable, as this Court has held. *Micro Focus* Order at 22. For example, this Court noted that the *Wiley Electrical and Electronics Engineering Dictionary* defines "emulator" as "[c]omputer hardware and/or software which is designed to work exactly like another" and states that computer "***simulations*** may be used to represent or ***emulate*** almost anything." *Id.* at 22; Malek Dec. ¶67; Ex. 10 at 256, 712. As another example, The Modern Dictionary of Electronics, Seventh Edition

gives extremely similar definitions of "simulate" and "emulate" and concludes each definition with "*see* emulate" and "*see* simulate," further indicating the terms are interchangeable. Malek Dec. ¶61; Ex. 11 at 257, 697. Dr. Malek cites and discusses a number of additional dictionary definitions submitted by both sides, including definitions where "emulate" is defined using the word "simulate" and where both terms are defined in nearly identical ways. Malek Dec. ¶63-81.

The intrinsic and extrinsic evidence confirms this Court's prior constructions of "simulate" and "emulate"—they are interchangeable and have their plain and ordinary meaning.

### B. "application"

| Term/Claim | Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "application"<br><br>'192 Pat. Cls. 1, 60, 65<br>'864 Pat. Cls. 1, 8<br>'678 Pat. Cs. 1, 21<br>'811 Pat. Cls. 1-2, 9, 22, 26<br>'579 Pat. Cls. 15-16, 20 | Plain meaning | "frame-based application" |

Chase again commits the "'cardinal sin' of importing limitations from the specification into the claims." *Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*, 824 F.3d 999, 1009 (Fed. Cir. 2016). Chase improperly asks the Court to limit "application" to example specification embodiments, without even alleging disclaimer or express definition, which would be required to deviate from the ordinary meaning. Contrary to Chase's position, the intrinsic evidence demonstrates the patentee used "frame-based application" when he meant "frame-based application," and used the broader term "application" when referring to applications in general.

Every asserted claim recites an "application" without the extra "frame-based" limitation. Other unasserted claims, however, specifically refer to a "frame-based application." This

illustrates that the patentee viewed "application" as having a broader scope than "frame-based application." Malek Dec. ¶¶144-46. For example, Claim 20 of the '864 Patent recites "[a] method for emulating an ***application***" whereas Claim 31 of the '864 Patent recites "[a] method for emulating a ***frame-based application***." The patentee explicitly limited certain claims to "frame-based" applications, and explicitly declined to limit other claims in this way.

Claim construction is not an invitation to blatantly rewrite claim language by importing limitations from other claims. Chase's expert never addresses '864 Claim 31 and never acknowledges that some claims recite a "frame-based application," whereas the asserted claims do not. *See* Chase Dec. ¶¶142-44. Chase ignores the differences between the claims because they show Chase is rewriting the claims, not construing them.

Likewise, the specification discloses some embodiments that refer to a "frame-based application," and other embodiments that refer to an "application" generally. For example, the Figure 1A embodiment describes a "frame-based application," but the Figure 14 embodiment describes an "application," which is ***not*** limited to a "frame-based application." *Compare* '192 Patent at Fig. 1A; *id.* at 4:53-56 ("FIG 1A shows one exemplary embodiment of a system 100 for emulating and profiling ***a frame-based application 104*** playing on a mobile device 114 that includes a Flash Player 116") *with* Fig. 14; *id.* at 14:34-35 ("FIG. 14 is a flowchart illustrating one method for determining whether ***an application*** of a mobile device is operable.").

The Abstract of each patent-in-suit is also directed to an "application" for a mobile device without any mention of "frame-based" applications, indicating the patentee viewed the invention as relating to "applications" and not limited to "frame-based applications." Malek Dec. ¶148. Moreover, the title of each patent also references a "mobile application" generally with no "frame-based" qualifier. Malek Dec. ¶150. Dr. Malek further explains that the specification "refers to

'Flash MX or Studio 8 from MacroMedia' as an example of a frame-based application development tool. '192 Patent at 5:5-8. However, the specification also references Java, .NET, and BREW as examples of mobile application development platforms. *See id.* at 3:40-47. A POSITA would have recognized that Java, .NET, and BREW could be used to develop mobile applications that are not 'frame-based.'" Malek Dec. ¶151. Thus, the intrinsic evidence discloses some embodiments that are limited to "frame based" applications (such as Fig. 1A and "Flash MX or Studio 8 from MacroMedia"), and also discloses other embodiments that are not limited to frame-based applications (such as Fig. 14, Java, .NET, and BREW).

Chase's expert ignores the intrinsic evidence that does not support his preferred conclusion. He does not cite or mention Figure 14 or its accompanying written description in column 14 of the '192 common specification. He also does not address the column 3 disclosures related to Java, .NET, and BREW, which describe these non-frame-based platforms as "frontrunners" that "have taken great strides" in the development of mobile applications. '192 Patent at 3:40-41. After ignoring these disclosures, Chase's expert opines that references to frame-based applications are "ubiquitous throughout the specifications." Chase Dec. ¶133. But even if frame-based embodiments were the only disclosed embodiments (they are not), it would still be legal error to limit the term "application" to these embodiments. "[I]t is improper to read limitations from a preferred embodiment described in the specification—***even if it is the only embodiment***—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Sorrell Holdings, LLC v. Infinity Headwear & Apparel, LLC*, No. 2022-1964, 2024 U.S. App. LEXIS 2487, at *5 (Fed. Cir. Feb. 5, 2024).

Although he ignores the column 3 disclosures that praise Java, .NET, and BREW, Chase's expert cites a passage in the provisional that he claims disparages these platforms. Chase Dec.

13

¶145. But this passage does not disparage Java, .NET, and BREW and does not say that they are outside the scope of the invention. Instead, it describes them as "the main platforms for mobile content today" but notes that they have a "static timeline" and cannot "'jump' to any digital frame" because they are not frame-based. Ex. 12 at 15. This supports Wapp's position—the "main platforms" for developing mobile applications at the time of the invention were not frame-based, and therefore a POSITA would not have understood "application" as limited to frame-based applications. Furthermore, this discussion in the provisional is in reference to the "Kiwi Open Application Platform™," which is a non-limiting example embodiment.

It is noteworthy that no defendant in any prior proceeding sought to limit "application" to a "frame-based application." The fact that these sophisticated defendants and their experts did not view "application" as limited to "frame-based" is evidence that a POSITA would not view "application" as limited in this way. Malek Dec. ¶153. The Court should reject Chase's invitation to commit legal error and instead give "application" its plain and ordinary meaning.

### C. "system for [testing/developing] an application for a mobile device"

| Terms/Claims | Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "system for testing an application for a mobile device"<br><br>'864 Pat. Cl. 1<br>'678 Pat. Cl. 1 | The preamble is limiting; plain meaning | Not limiting |
| "system for developing an application for a mobile device"<br><br>'192 Pat. Cl. 1 | The preamble is limiting; plain meaning | Not limiting |

14

Chase incorrectly argues these preambles are non-limiting. Chase's expert does not address these preambles at all, so the reasoning behind Chase's position is unclear. In the *Micro Focus* case, this Court held each preamble is limiting. *Micro Focus* Order at 13 ("the preambles of Claim 1 of the '192 Patent, Claim 1 of the '864 Patent, and Claims 1, 26, and 45 of the '678 Patent ***are limiting***"). In support of this correct holding, the Court observed "[w]hen limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention." *Id.* at 11 (quoting *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003)). In the subsequent cases against Wells Fargo and Bank of America, the parties agreed with the Court's prior construction that these preambles are limiting. Bank Case Order at 8.

The Court's previous constructions were correct. These preambles are limiting because each provides antecedent basis for two claim terms and because each "recites essential structure" and "is necessary to give life, meaning, and vitality to the claim." *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1323 (Fed. Cir. 2015). These preambles provide antecedent basis for "the mobile device" and "the application" terms. Claim 1 of the '864 Patent is representative:

> 1. A system for testing **an application** for **a mobile device** comprising:
>
> software configured to simulate, via one or more profile display windows, a plurality of network characteristics indicative of performance of **the mobile device** when executing **the application**; wherein the network characteristics are based on data of interaction with networks in non-simulated environments.

*See also* '678 Pat. Cl. 1, '192 Pat. Cl. 1 (same antecedent basis relationships). The multiple antecedent basis relationships that link these preambles to the bodies of their respective claims are strong indicators that the preambles "act as a necessary component of the claimed invention" and are limiting. Malek Dec. ¶93.

15

These preambles also "recite essential structure" and are not "merely duplicative of the body of the claim." *TomTom*, 790 F.3d at 1323-24. They include the phrases "system for testing an application" and "system for developing an application." These phrases specify the capabilities of the claimed system—that the system must be capable of either "testing" or "developing" an "application." These limitations are not merely duplicative of the bodies of the claims. The body of claim 1 of the '864 Patent does not recite "testing." The body of claim 1 of the '192 Patent does not recite "developing." The body of claim 1 of the '678 Patent does recite "testing," but only in the context of a "software testing interface." These structural, non-duplicative claim limitations further indicate the preambles are limiting. Malek Dec. ¶94.

Finally, each preamble also recites "an application *for* a mobile device," a structural phrase not duplicated in the bodies of the claims. The specification repeatedly refers to the concept of "an application *for* a mobile device" as distinct from a generic "application." *See, e.g.*, '192 Patent 1:61-65, 9:50-51, 14:19-24. This claimed structure reinforces the essential and non-duplicative nature of these preambles and shows they are limiting. Malek Dec. ¶96-98.

## VI.    TERMS CHASE CONTENDS ARE INDEFINITE

Chase contends the remaining six groups of terms are indefinite and does not propose a construction for these terms. "Indefiniteness must be proven by clear and convincing evidence," a burden Chase cannot meet. *Sonix Tech. Co. v. Publ'ns Int'l, Ltd*., 844 F.3d 1370, 1377 (Fed. Cir. 2017). A claim is not indefinite if, viewed in light of the specification and prosecution history, it "inform[s] those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). Breadth is not the same thing as indefiniteness, and "a claim is not indefinite just because it is broad." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1347 (Fed. Cir. 2022).

Where a term allegedly lacks antecedent basis, that term is not indefinite so long as the antecedent basis relationship is reasonably certain in the context of the claim as a whole. *Integrated Claims Sys., LLC v. Old Glory Ins. Co.*, No. 2:15-cv-412-JRG, 2020 U.S. Dist. LEXIS 214425, at *18-20 (E.D. Tex. Nov. 17, 2020). Explicit antecedence is not required, and "[a] claim is not invalid for indefiniteness if its antecedent basis is present by implication." *Fisher-Price, Inc. v. Graco Children's Prods.*, 154 F. App'x 903, 909 (Fed. Cir. 2005).

### A. "the connection simulation"

| Term/Claim | Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "the connection simulation" '192 Pat. Cl. 4 | Plain meaning | Indefinite |

Chase contends this term lacks antecedent basis. That is wrong as a matter of law. This term's explicit antecedent basis is "one or more connection simulations" in '192 claim 2:

> 2. The system of claim 1, wherein the software authoring interface is configured to enable a user to select from ==one or more connection simulations== for testing how well mobile content performs on the mobile device.

> 4. The system of claim 2, wherein ==the connection simulation== includes one or more profiles.

'192 Patent claims 2, 4.

Just as the article "a" means "one or more" in the parlance of patent law, the article "the" also means "one or more" when it refers back to a plural claim term (as it does here). "That 'a' or 'an' can mean 'one or more' is best described as a rule, rather than merely as a presumption or even a convention. … The ***subsequent use of definite articles 'the'*** or 'said' in a claim to refer back to the same claim term does not change the general plural rule, but ***simply reinvokes that non-singular meaning***. … Because the initial indefinite article ('a') carries either a singular or

plural meaning, any later reference to that same claim element merely reflects the same potential plurality." *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008).

      To put it another way, suppose claim 2 recited "select from *a* connection simulation." The phrase "*a* connection simulation" clearly provides antecedent basis for "*the* connection simulation." But "*a* connection simulation" is exactly equivalent to claim 2's current wording, because "a" means "one or more." Claim 2's initial reference to "one or more connection simulations" carries either a singular or plural meaning, and subsequent use of the definite article "the" to refer back to it simply reinvokes that same "one or more" meaning. *Id.* Furthermore, the surrounding claim 4 language ("includes *one or more* profiles") underscores this meaning.

      Chase's expert errs because he assumes "the" must be singular, which is legally incorrect. Chase's expert says "a POSA would understand 'the connection simulation' to be *one of* the 'one or more connection simulations,' but the language does not provide guidance on which one." Chase Dec. ¶213. As a matter of law, "the connection simulation" refers back to *all of* the "one or more connection simulations," not one of them. Chase's expert ignores this reading, thereby ignoring the legally correct way to read the claims. *See* Malek Dec. ¶¶83-86.

    **B.** **"the monitored resource"**

| Term/Claim | Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| **"the monitored resource"** <br><br> '579 Pat. Cls. 15, 27 | Plain meaning | Indefinite |

    This term has explicit antecedent basis as shown:

        ==monitor utilization of one or more resources== of the mobile device over time by an application running on a simulation of the mobile device;

        display a representation of one or more of ==**the monitored resource**==;

'579 Patent Cl. 15; *see also* Cl. 27 (same antecedent basis).

Chase and its expert make the same mistake again by assuming the word "the" cannot refer to a plurality. Starting from this flawed premise, they argue this term lacks antecedent basis because "the phrase 'monitor utilization of one or more resources of the mobile device' does not specify which of the 'one or more resources' is a monitored resource." Chase Dec. ¶225. This argument does not make sense because "the monitored resource" can refer to a plurality of resources; it means "the one or more monitored resources" and it refers back to the "one or more resources" whose utilization is being monitored. *Baldwin*, 512 F.3d at 1342; *see also* Malek Dec. ¶162 ("a POSITA would readily understand that 'the monitored resource' of the next limitation … refers back to the 'one or more resources' whose use by the application is being monitored"). The surrounding claim language ("***one or more of*** the monitored resource") also shows that "the monitored resource" may refer to a plurality of resources, *i.e.*, more than one monitored resource.

Chase's expert argues "the phrase 'monitor utilization of one or more resources' recites monitoring utilization, not monitoring resources." Chase Dec. ¶225. Chase's expert fails to explain how this hairsplitting distinction renders the claim indefinite. A POSITA would understands when you "monitor utilization" of a resource, that resource is being "monitored." If a business monitors utilization of its copy machine, the copy machine is being monitored. There is no ambiguity.

Finally, Chase's expert claims that "the '579 patent does not provide any guidance or an explanation to a POSA of the meaning of the phrase 'display a representation of one or more of the monitored resources' with reasonable certainty." Chase Dec. ¶226. This is incorrect. The specification provides multiple examples of monitoring resources and displaying them, *e.g.*:



'192 Patent Fig.; *id.* at 9:12-14 ("Window 500 facilitates interaction with model 102 through display 400 and **monitoring of resource utilization of application 104 through window 300**"); *id.* at 8:54-55 ("**Display 300 clearly displays processor resource utilization**"). Dr. Malek describes additional examples where the specification teaches displaying a representation of the monitored resources. Malek Dec. ¶¶163-66.

This claim term has explicit antecedent basis, but even if it lacked explicit antecedent basis, the term is not indefinite so long as the antecedent basis relationship is "reasonably certain" in the context of the claim as a whole. *Integrated Claims Sys.*, 2020 U.S. Dist. LEXIS 214425, at *18-20. The antecedent basis relationship in this claim is clear, and Chase has not shown otherwise.

## C.  "network characteristics indicative of performance of the mobile device"

| Terms/Claims | Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| **"network characteristics indicative of performance of the mobile device [when executing the application]"**<br><br>'192 Pat. Cl. 1<br>'864 Patent Cl. 1 | Plain meaning | Indefinite |
| **"operator network characteristics including at least bandwidth availability indicative of performance of the mobile device when executing the application"**<br><br>'678 Pat. Cl. 1 | Plain meaning | Indefinite |

Chase's expert acknowledges this Court has previously construed "network characteristics" and "indicative of" and concedes that neither term is indefinite. Chase Dec. ¶149; *see also* Bank Case Order at 11-21, 29-37. Nonetheless, Chase's expert wrongly contends the larger phrases are indefinite based on his artificially narrow interpretation of "performance of the mobile device." *Id.* ¶¶151, 157-58. Chase's expert interprets "performance of the mobile device" as limited to performance of the mobile device's ***processor*** and further limits the term by saying it only covers "how the processing operates, not what the processing operates on." *Id.* ¶151. After taking this nonsensically narrow view, Chase's expert opines that a POSITA would not understand these terms. *Id.* ¶150. A POSITA would readily understand these terms, and Chase's artificial confusion is the result of its nonsensically narrow interpretation of the claims.

The claim language makes clear how network characteristics can be indicative of "performance of the mobile device." Claim 1 of the '678 Patent recites "operator network characteristics *including at least bandwidth availability* indicative of performance of the mobile device when executing the application." This claim language gives an express example of a "network characteristic" that is "indicative of performance of the mobile device," namely "bandwidth availability." This makes sense—when your phone has ample network bandwidth available, it tends to perform well when running a mobile application that requires a network connection (such as Chase's mobile app). When your phone has little network bandwidth available, it tends to perform poorly. "A POSITA would understand that the amount of bandwidth available can indicate how a mobile device performs when executing an application." Malek Dec. ¶109.

Chase's expert strangely argues a POSITA would not understand the term "bandwidth availability,"[6] even though he concedes the term "bandwidth" was "a term of art and is used in the specification" and defined in contemporaneous technical dictionaries. Chase Dec. ¶169-71. This is another example of Chase's manufactured confusion. Chase concedes a POSITA would understand "bandwidth." A POSITA would also understand "bandwidth availability." "A POSITA would have understood the plain and ordinary meaning of 'bandwidth availability' to refer to the amount of bandwidth available. In other words, 'availability' is being used in its ordinary English sense to refer to an amount of something that is available." Malek Dec. ¶118.

Claim 1 in each patent also refutes Chase's expert's incorrect belief that "performance of the mobile device" is limited to "how the processing operates, not what the processing operates

---

[6] Chase waived this indefiniteness theory by not disclosing it in its invalidity contentions. Ex. 13 at 112-13. *See Seven Networks, LLC v. Google LLC*, No. 2:17-CV-00442-JRG, 2018 U.S. Dist. LEXIS 220233, at *14 (E.D. Tex. July 11, 2018) (striking indefiniteness theory not disclosed in invalidity contentions).

on." Each claim recites "performance of the mobile device *when executing the application*." The claim language states the application is something the mobile device is "executing," in other words "operating on." This too contradicts Chase's artificially narrow interpretation.

The specification gives additional examples of "network characteristics indicative of performance of the mobile device" that inform a POSITA about the meaning of this term with reasonable certainty. For example, the specification describes an embodiment in which "Window 1200 shows a pull-down list 1202 [containing list 1206] of *network characteristics* … the user may select *send message from list* 1206 to evaluate the *performance* of application 104 while a *message is received from the network*." '192 Patent at 12:3-20. "A POSITA would understand that receiving a message from the network can indicate how a mobile device performs when executing an application." Malek Dec. ¶113. Thus, receiving a message from a network is another example of "network characteristics indicative of performance of the mobile device."

The preceding specification passage also contradicts Chase's expert's opinion that "performance of the mobile device" is limited to performance of the processor. This passage does not mention the processor, indicating that "performance" is not so limited. Other parts of the common specification tell the same story. The specification lists twelve "exemplary characteristics that may be used to specify *performance* of model 102 to emulate *mobile device* 114" and states that "additional or fewer characteristics may be included." '192 Patent at 5:55-6:13, 6:45. Only three of these twelve example characteristics relate to the "processor," which shows that "performance of the mobile device" is not limited to the processor.

Both the specification and the claims give specific examples (*e.g.*, bandwidth availability and receiving a message) of "network characteristics indicative of performance of the mobile device," demonstrating a POSITA would readily understand the meaning of this phase. Neither

the specification nor the claims support artificially limiting "performance of the mobile device" in the manner proposed by Chase's expert.

### D. **"on the mobile device"**

| Terms/Claims | Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| **"on the mobile device"**<br><br>'192 Pat. Cl. 60 | Plain meaning | Indefinite |

Chase argues indefiniteness because the first use of "the mobile device" is preceded by the word "the" instead of "a." But whether the term uses "a" or "the" is of no import here because its meaning is unambiguous in light of the claim language and specification. *In re Downing*, 754 F. App'x 988, 996 (Fed. Cir. 2018) ("a claim term that lacks an antecedent basis may, but does not necessarily, render a claim indefinite … claim 1's recitation of one end user could only refer to the end user using the product. Who else could the end user be? We therefore agree with Downing that the claims are not indefinite for lacking an antecedent basis for 'the end user'"); *Polaris Powerled Techs., LLC v. Samsung Elecs. Am., Inc.*, No. 2:22-cv-00469-JRG, 2024 U.S. Dist. LEXIS 106029, at *39 (E.D. Tex. June 14, 2024) (construing "*the* first connector of the connection" as "*a* first connector of the connection" in light of the intrinsic evidence). The test is, as always, whether the meaning of the claim is reasonably certain to a POSITA in light of the specification and prosecution history. *Nautilus*, 134 S. Ct. at 2129.

The meaning of claim 60 is clear (at least "reasonably certain"), as shown below:

60. A system comprising:

an application configured to enable a user to modify a photo on ==the mobile device==, wherein the application is developed using a software authoring platform configured to simultaneously visually emulate, via one or more profile display windows, a plurality of hardware

24

characteristics indicative of performance of **<mark>the mobile device</mark>** when executing the application.

"It is apparent from the context of the claim that both instances of 'the mobile device' refer to the same thing, *i.e.*, the first instance of 'the mobile device' provides antecedent basis for the second instance. This is the only reasonable way to interpret the claim, and this is how a POSITA would interpret it." Malek Dec. ¶133. As in *Downing*, there is only one mobile device this claim is talking about—the mobile device executing the application. What else could "the mobile device" be? Chase's expert does not propose any other way of interpreting this claim or identify any other potential candidates for what "the mobile device" could mean. *See* Chase Dec. ¶¶200-07. Because "the mobile device" can only mean one thing, its meaning is reasonably certain.

The specification supports this understanding. The specification is replete with disclosures of developing an application for a mobile device by simulating/emulating that same mobile device on a computer, *e.g.*:

> In one embodiment, a method emulates and profiles an application to play on *a mobile device* that includes a Flash Player. Characteristics defining performance of the mobile device are loaded. *The mobile device* is emulated using a model based upon the characteristics.

'192 Patent at 2:13-17. These disclosures use the term "mobile device" in the same way as '192 Claim 60, further confirming that a POSITA would understand '192 Claim 60 with reasonable certainty in light of the intrinsic evidence. Malek Dec. ¶¶136-41. Dr. Malek discusses additional examples of these specification disclosures in his declaration and concludes the "consistent specification teachings would further inform a POSITA that both instances of 'mobile device' have the same meaning in '192 Claim 60, and that the first instance of 'mobile device' provides antecedent basis for the second instance of 'mobile device.'" *Id.* ¶139.

Although using the word "the" instead of the word "a" to introduce a claim element may be suboptimal claim drafting, there is no uncertainty about the meaning of claim 60. In the alternative, this claim is not indefinite because the Court can correct "on ***the*** mobile device" to "on ***a*** mobile device" as an obvious minor typographical error. "A district court may correct 'obvious minor typographical and clerical errors in patents.'" *Pavo Sols. LLC v. Kingston Tech. Co.*, 35 F.4th 1367, 1373 (Fed. Cir. 2022). "Correction is appropriate 'only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims.'" *Id.* There is no reasonable debate that "on ***the*** mobile device" has the same meaning as "on ***a*** mobile device" in the context of this claim. Chase's expert does not propose any alternative interpretation of the claim, which as noted above is supported by the specification.

### E.  <u>"select one or more characteristics associated with a mobile device"</u>

| Term/Claim | Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| **"select one or more characteristics associated with a mobile device"**<br><br>'579 Pat. Cl. 15 | Plain meaning | Indefinite |

Chase's expert argues this term is indefinite because "it is unclear as to which characteristics are selected." Chase Dec. ¶184. The claim language refutes this opinion—the characteristics selected are "one or more characteristics associated with a mobile device." The specification also provides examples of "mobile device characteristics" that can be selected, *e.g:*

26

| TABLE 1 | |
|---|---|
| Mobile Device Characteristics | |
| Parameter | Value |
| Name | NOKIA 3650 |
| Processor | ARM 4T |
| Processor Speed | 104 MHz |
| Storage Access Speed | 5.88 files/second |
| RAM Size | 256 MB |
| Storage Size | 512 MB |
| Display Width | 256 |
| Display Height | 394 |
| Pixel Depth | 24 |
| Processor Availability | 60% |
| RAM Availability | 60% |
| Storage Availability | 40% |

'192 Patent at 5:55-6:10. "Table 1 Mobile Device Characteristics shows exemplary ***characteristics that may be used to specify performance of model 102 to emulate mobile device*** 114." *Id.* at 6:11-13 (emphasis added); *see also id.* at 6:11-47 (explaining the mobile device characteristics of Table 1). Dr. Malek explains a "POSITA would understand with reasonable certainty the scope of the term 'characteristics associated with a mobile device.' And a POSITA would certainly understand the selection of one or more such characteristics." Malek Dec. ¶159; '192 Patent at 9:23-36 ("In one example of step 602, a user of window 500 ***selects*** a mobile device using pull-down list 502 and emulator 101 loads ***mobile device characteristics*** 115 into memory 132").

Chase's expert's opinion is based on a misinterpretation of this Court's prior claim construction order. Chase Dec. ¶183. This Court previously held that '579 claim 1 was indefinite because "the selected characteristics" lacked antecedent basis. Bank Case Order at 37-42. The Court reached this conclusion because the claim only recited selecting a "mobile device type" and did not recite selecting any "characteristics." *Id.* at 40 ("because the 'simulate…' limitation refers to the 'mobile device type' (rather than the 'characteristics') as being 'selected,' the recital of 'one or more characteristics of a selected mobile device type' does not provide implicit antecedent basis for the recital of 'the selected characteristics.'"). Because claim 1 did not recite selecting any

27

characteristics, this Court held the term "the selected characteristics" lacked antecedent basis because it was "unclear as to *which* characteristics are selected." *Id.* at 41.

Chase's expert has misinterpreted this Court's prior holding to mean that ***any*** claim limitation having to do with selecting characteristics must be indefinite. *See* Chase Dec. ¶184. That is not what the Court held, and the Court's prior holding is not applicable here. *First*, Chase does not allege this term lacks antecedent basis, but the Court's prior holding was premised on a lack of antecedent basis. Bank Case Order at 42. *Second*, the Court' prior holding was based on the fact that '579 claim 1 ***does not*** recite selecting any characteristics, but '579 Claim 15 ***does*** explicitly recite "select one or more characteristics" and also makes clear *which* characteristics are selected, namely, "one or more characteristics associated with a mobile device." As shown above, the specification describes these mobile device characteristics and provides examples of how they can be selected. A POSITA would therefore understand with reasonable certainty what it means to "select one or more characteristics associated with a mobile device."

### F. "the physical mobile device"

| Term/Claim | Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| **"the physical mobile device"**<br><br>'579 Pat. Cls. 15-16 | Plain meaning | Indefinite |

Chase's expert argues this term lacks antecedent basis, but the antecedent basis is clear:

15. A non-transitory, computer-readable medium comprising software instructions for developing an application to be run on a mobile device, wherein the software instructions, when executed, cause a computer to:

select one or more characteristics associated with **a mobile device**;

monitor utilization of one or more resources of the mobile device over time by an application running on **a simulation of the mobile device**;

> display a representation of one or more of the monitored resource;
>
> correspond the utilization of a specific displayed resource at a given time with one or more functions, or code, or both of the application responsible for that utilization;
>
> initiate transmission of the application on **a simulation of the mobile device**, or to **the physical mobile device**, or both.

This claim recites two distinct concepts: (1) a "mobile device," which is a physical device; and (2) a "simulation of the mobile device," which is a computer simulation of that physical object. Malek Dec. ¶170 ("a POSITA would recognize that a mobile device refers to a physical object").

Chase's expert's argument is premised on the false idea that "a mobile device" is not a physical object but only refers to a simulation. Chase Dec. ¶236. Chase's expert's support for this statement is that "'a mobile device' provides the antecedent basis for 'the mobile device,' which is the subject of 'a simulation.'" Chase Dec. ¶235. But this does not mean "a mobile device" is a simulation. A rock is a physical object, but "a picture of the rock" can be a digital object stored on a computer or phone. "A POSITA would understand that a 'simulation of the mobile device' is different than 'a mobile device.' Stated differently, a cellular phone is not the same as a simulation of a cellular phone." Malek Dec. ¶171. This is clear from the plain language of the claim.

Chase's expert also argues "a POSA would not understand whether 'the physical mobile device' relates back to 'a mobile device' which is the subject of the simulation on which an application is to be run, or 'a mobile device' associated with one or more characteristics, which are both recited in claim 15." Chase Dec. ¶236. This is misleading because all instances of "a mobile device" refer to the same physical mobile device—the device whose characteristics are being selected is the same device that is being simulated. Subsequent references to "a simulation of the mobile device" refer to a computer simulation of that physical mobile device.

The specification also consistently uses the phrase "mobile device" to refer to a physical device. *See, e.g.*, '192 Patent at 1:25 (discussing shipping of "mobile devices"); *id.* at 1:58-61 ("Currently, the only way to determine if an application plays on a particular **mobile device** is to transfer the application to the device and play it."). On the other hand, a simulation of a mobile device is discussed differently. For example, the emulator "generates **a mobile device model** 102, based upon mobile device characteristics 115 of mobile device 114." *Id.* at 4:57-59. Likewise, Figure 7 illustrates the transmission of an application to either a simulation of a mobile device or a physical mobile device. *Id.* at 9:54-58 ("In step 704, method 700 plays the application within **an emulation of the mobile device**. In one example of step 704, emulator 101 generates model 102 based upon characteristics 115 of mobile device 114 and then **loads and plays application 104 within model 102**."). Later, once adequate testing has been performed, the application can be transferred to the physical mobile device, which is just referred to as a "mobile device." *Id.* at 10:26-29 ("In step 716, method 700 transfers the application to **the mobile device**."). These disclosures consistently show that references to a "mobile device," without qualifiers, mean a physical mobile device to a person of ordinary skill in the art. Malek Dec. ¶174-78.

Chase's expert also argues the file history supports his opinion because an amendment replaced the phrase "physical versions of the mobile device" with the phrase "the physical mobile device." Chase Dec. ¶243. Chase's expert concedes the phrase "'physical versions of the mobile device' is clear" but for some reason believes the phrase "the physical mobile device" is unclear. Both ways of writing the claim are clear. There is no indication the patentee intended to change the meaning of this term, and Chase's expert does not explain how this slight change in wording could render the claim indefinite.

Dated: September 24, 2024                    Respectfully submitted,

                                             By: /s/ *Alden G. Harris*
                                                 Leslie V. Payne
                                                 State Bar No. 0784736
                                                 lpayne@hpcllp.com
                                                 R. Allan Bullwinkel
                                                 State Bar No. 24064327
                                                 abullwinkel@hpcllp.com
                                                 Alden G. Harris
                                                 State Bar No. 24083138
                                                 aharris@hpcllp.com
                                                 Christopher L. Limbacher
                                                 State Bar No. 24102097
                                                 climbacher@hpcllp.com
                                                 Carlos I. Ruiz
                                                 State Bar No. 24110614
                                                 cruiz@hpcllp.com
                                                 HEIM PAYNE & CHORUSH, LLP
                                                 609 Main Street, Suite 3200
                                                 Houston, Texas 77002
                                                 Telephone: (713) 221-2000
                                                 Facsimile: (713) 221-2021

                                                 J. Michael Young
                                                 **WYNNE, SMITH & YOUNG, PLLC**
                                                 Texas State Bar No. 00786465
                                                 707 W. Washington
                                                 Sherman, Texas 75092
                                                 (903) 893-8177
                                                 (903) 892-0916 (fax)
                                                 E-mail: myoung@wynnesmithlaw.com

                                                 **ATTORNEYS FOR PLAINTIFFS**
                                                 **WAPP TECH LIMITED PARTNERSHIP and**
                                                 **WAPP TECH CORP.**

## CERTIFICATE OF SERVICE

I hereby certify that on September 24, 2024, a copy of the foregoing and attachments thereto were served via the Court's ECF system on all counsel of record in this matter.

*/s/ Alden G. Harris*
Alden G. Harris