**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| WAPP TECH LIMITED PARTNERSHIP and WAPP TECH CORP., | |
| Plaintiffs, | Civil Action No. 4:23-cv-01137-ALM |
| v. | JURY TRIAL DEMANDED |
| JPMORGAN CHASE BANK, N.A. | |
| Defendant. | |

**<u>DEFENDANT'S P.R. 4-5(b) RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>**

## <u>TABLE OF CONTENTS</u>

**Page**

I.      Introduction ............................................................................................................. 1

II.     The Asserted Patents ............................................................................................. 2

III.    Legal Standards ..................................................................................................... 2

IV.     Disputed Claim Limitations .................................................................................. 2

        A.      "Emulate" & "Simulate" ............................................................................ 2

                1.      "Emulate" And "Simulate" Have Different Meanings ............................ 2

                2.      Intrinsic And Extrinsic Evidence Establish That "Emulate" Means
                        "Model The Hardware" ........................................................................... 5

                3.      The Intrinsic and Extrinsic Evidence Establish That "Simulate"
                        Means "Represent Features Of" .............................................................. 8

                4.      Wapp's Remaining Arguments Are Without Merit ................................. 9

        B.      "Application" ............................................................................................ 10

        C.      Preamble: "System for [testing/developing] an application for a mobile
                device" ...................................................................................................... 17

        D.      Indefinite Terms ...................................................................................... 18

                1.      "select one or more characteristics" ..................................................... 18

                2.      "the physical mobile device" ................................................................ 20

                3.      "on the mobile device" .......................................................................... 23

                4.      "network characteristics indicative of performance of the mobile
                        device [when executing the application]" .............................................. 25

                5.      "the connection simulation" .................................................................. 28

                6.      "the monitored resource" ...................................................................... 30

V.      Conclusion ............................................................................................................ 30

## <u>TABLE OF AUTHORITIES</u>

**Page**

<span style="font-variant: small-caps;">Cases</span>

*Acceleration Bay, LLC v. Activision Blizzard Inc.*,
  908 F.3d 765 (Fed. Cir. 2018)................................................................17

*AFG Indus., Inc. v. Cardinal IG Co.*,
  239 F.3d 1239 (Fed. Cir. 2001)...............................................................25

*Amgen Inc. v. Sandoz Inc.*,
  923 F.3d 1023 (Fed. Cir. 2019)................................................................4

*Apple Inc. v. Omni MedSci, Inc.*,
  2024 WL 3084509 (Fed. Cir. 2024)......................................................2, 5

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
  672 F.3d 1335 (Fed. Cir. 2012)................................................................5

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
  512 F.3d 1338 (Fed. Cir. 2008)..............................................................22

*Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*,
  359 F.3d 1367 (Fed. Cir. 2004)................................................................2

*Bd. Of Regents of the Univ. of Tex. v. BENQ Am. Corp.*,
  533 F.3d 1362 (Fed. Cir. 2008).....................................................3, 20, 22

*Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*,
  813 F. App'x 522 (Fed. Cir. 2020) ..........................................................20

*Chef Am. Inc. v. Lamb Weston, Inc.*,
  358 F.3d 1371 (Fed. Cir. 2004)...............................................................24

*Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*,
  677 F.3d 1361 (Fed. Cir. 2012)................................................................4

*Chimie v. PPG Indus., Inc.*,
  402 F.3d 1371 (Fed. Cir. 2005)................................................................1

*Eaton Corp. v. Rockwell Int'l Corp.*,
  323 F.3d 1332 (Fed. Cir. 2003)...............................................................18

## TABLE OF AUTHORITIES

(continued)

**Page**

*Edwards Lifesciences LLC v. Cook Inc.*,
    582 F.3d 1322 (Fed. Cir. 2009)......................................................................11

*Exxon Chem. Patents, Inc. v. Lubrizol Corp.*,
    64 F.3d 1553 (Fed. Cir. 1995)......................................................................19

*Goldenberg v. Cytogen, Inc.*,
    373 F.3d 1158 (Fed. Cir. 2004)....................................................................15

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010)......................................................................24

*Imperium IP Holdings, Ltd. v. Samsung Elecs. Co.*,
    2015 WL 3761904 (E.D. Tex. 2015) ..............................................................5

*Int'l Rectifier Corp. v. IXYS Corp.*,
    361 F.3d 1363 (Fed. Cir 2004)......................................................................4

*Ironworks Patents. LLC v. Samsung Elecs. Co.*,
    798 F. App'x 621 (Fed. Cir. 2020) ..............................................................11

*Microsoft Corp. v. AT&T Corp.*,
    550 U.S. 437 (2007)....................................................................................18

*Miken Composites, L.L.C. v. Wilson Sporting Goods Co.*,
    515 F.3d 1331 (Fed. Cir. 2008)..................................................................1, 3

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014)..........................................................................1, 20, 25

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008)......................................................................9

*Panasonic Corp. v. Magna Int'l Inc.*,
    2022 WL 625089 (W.D. Tex. Mar. 3, 2022) ................................................17

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc)..................................................5, 10

*Poly-Am., L.P. v. API Indus., Inc.*,
    839 F.3d 1131 (Fed. Cir. 2016)....................................................................13

## TABLE OF AUTHORITIES
(continued)

Page

*Quantum Corp. v. Rodime, PLC*,
   65 F.3d 1577 (Fed. Cir. 1995)..................................................................................1, 25

*Renishaw PLC v. Marposs Societa' Per Azoni*,
   158 F.3d 1243 (Fed. Cir. 1998)....................................................................................14

*Sequoia Tech., LLC v. Dell, Inc.*,
   66 F.4th 1317 (Fed. Cir. 2023) ......................................................................................7

*Smartflash LLC v. Apple Inc.*,
   77 F. Supp. 3d 535 (E.D. Tex. 2014)...........................................................................25

*Summit 6, LLC v. Samsung Elecs. Co.*,
   802 F.3d 1283 (Fed. Cir. 2015).....................................................................................17

*Synchronoss Tech., Inc. v. Dropbox, Inc.*,
   987 F.3d 1358 (Fed. Cir. 2021).....................................................................................21

*Takeda Pharm. Co. v. Zydus Pharms. Inc.*,
   743 F.3d 1359 (Fed. Cir. 2014).....................................................................................29

*Tex. Instruments, Inc. v. Linear Techs. Corp.*,
   182 F. Supp.2d 580 (E.D. Tex. 2002)............................................................................4

*TomTom, Inc. v. Adolph*,
   790 F.3d 1315 (Fed. Cir. 2015).....................................................................................18

*Trustees of Columbia Univ. v. Symantec Corp.*,
   811 F.3d 1359 (Fed. Cir. 2016).............................................................................1, 7, 26

*TVnGO Ltd. v. LG Elecs. Inc.*,
   861 F. App'x 453 (Fed. Cir. 2021) ...............................................................................27

*UltimatePointer, L.L.C. v. Nintendo Co.*,
   816 F. 3d 816 (Fed. Cir. 2016)................................................................................14, 15

*Visible Connections, LLC v. Zoho Corp.*,
   418 F. Supp.3d 155 (W.D. Tex. 2019)...........................................................................17

*Wapp Tech Ltd. P'ship et al. v. Seattle Spinco et al.*,
   No. 4:18-cv-00469-ALM, Dkt. 176 (E.D. Tex. Apr. 27, 2020) .....................................vi, 9, 18

iv

## <u>TABLE OF AUTHORITIES</u>

(continued)

**Page**

*Wapp Tech Ltd. P'ship et al. v. Wells Fargo Bank, N.A.*,
    No. 4:21-cv-671-ALM, Dkt. 96 (E.D. Tex. July 6, 2022)..............................................*vi*, 18, 19

*Zenon Env'tl, Inc. v. U.S. Filter Corp.*,
    506 F.3d 1370 (Fed. Cir. 2007).................................................................................................25

## TABLE OF ABBREVIATIONS

| ABBREVIATION | DESCRIPTION | DOCKET/ EXHIBIT NO. |
|---|---|---|
| cl. | Claim | |
| POSA | Person of ordinary skill in the art | |
| Wapp | Wapp Tech Limited Partnership and Wapp Tech Corp. | |
| '192 patent | U.S. Patent No. 8,924,192 | Dkt. 64, Ex. 1 |
| '864 patent | U.S. Patent No. 9,298,864 | Dkt. 64, Ex. 2 |
| '678 patent | U.S. Patent No. 9,971,678 | Dkt. 64, Ex. 3 |
| '811 patent | U.S. Patent No. 10,353,811 | Dkt. 64, Ex. 4 |
| '579 patent | U.S. Patent No. 10,691,579 | Dkt. 64, Ex. 5 |
| '910 patent | U.S. Patent No. 7,813,910 | Ex. I |
| *Micro Focus* Order[1] | *Wapp Tech Ltd. P'ship et al. v. Seattle Spinco et al.*, No. 4:18-cv-00469-ALM, Dkt. 176 (E.D. Tex. Apr. 27, 2020) | Dkt. 64, Ex. 6 |
| Bank Cases Order | *Wapp Tech Ltd. P'ship et al. v. Wells Fargo Bank, N.A.*, No. 4:21-cv-671-ALM, Dkt. 96 (E.D. Tex. July 6, 2022) | Dk. 64, Ex. 7 |

---

[1] JPMC follows Wapp's convention of using "*Micro Focus* Order" when referring to this Court's claim construction order in *Wapp Tech et al. v. Seattle Spinco et al.*, No. 4:18-cv-00469-ALM, Dkt. 176, and "Bank Case Order" to refer to this Court's claim construction order in *Wapp Tech Ltd. P'ship et al. v. Wells Fargo Bank, N.A.*, No. 4:21-cv-671-ALM, Dkt. 96 (E.D. Tex. July 6, 2022). Dkt. 64 at 5, n.1, 6, n.2. Cites to "*Micro Focus* Order" and "Bank Cases Order" refer to Dkt. 64, Ex. 6 and Dkt. 64, Ex. 7, respectively.

## **TABLE OF EXHIBITS**

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| A | *Wapp Tech L'td. P'ship et al. v. Seattle Spinco,* No. 4:18-cv-00469, Plaintiffs Supplemental Submission Regarding Claim Construction, Dkt. 171 (E.D. Tex. April 21, 2020). |
| B | IBM Dictionary of Computing (10th ed. Int'l ed. 1994) (JPMC-00166569) |
| C | IEEE Standard Dictionary of Electrical and Electronic Terms (4th ed. 1988) (JPMC-00166575) |
| D | '192 File History, 10-17-2014 Amendment After Allowance |
| E | Joint Claim Construction Statement ("JCCS") |
| F | '579 File History, 11-18-2019 Response to Non-Final Rejection |
| G | *Wapp Tech L'td. P'ship et al. v. Seattle Spinco,* No. 4:18-cv-00469, Pretrial Hearing Transcript, Dkt. 428 (E.D. Tex. Feb. 22, 2021) |
| H | Expert Declaration of Daniel van der Weide, Ph.D. |
| I | U.S. Patent No. 7,813,910 |

\* All emphasis added throughout, except where otherwise noted.

\*\* Internal citations and quotations omitted throughout, except where otherwise noted.

\*\*\* Citations to the Dkt. 64 refer to the page number at the top of the page.

I.    **INTRODUCTION**

The parties' claim construction disputes fall into two categories.  First, there are three claim terms for which JPMC offers specific constructions reflecting the terms' ordinary meanings in view of the intrinsic evidence.  *Infra* IV.A-C.  JPMC's constructions adhere to the Federal Circuit's guidance that "[t]he only meaning that matters in claim construction is the meaning in the context of the patent."  *Trustees of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016).  By contrast, Wapp avoids giving any fixed meaning to these terms, which frustrates the purpose of claim construction.  "Courts construe claim terms in order to assign a fixed, unambiguous, legally operative meaning to the claim."  *Chimie v. PPG Indus., Inc*., 402 F.3d 1371, 1377 (Fed. Cir. 2005).  Construing these terms is necessary because: (i) the parties dispute the scope of the ordinary meaning; (ii) though not entirely dispositive, it will streamline infringement and invalidity issues; and (iii) it will assist the jury in evaluating those issues.

Second, there are six terms for which the parties dispute indefiniteness, which is a question of law.  *Infra* IV.D.  JPMC establishes that skilled artisans cannot determine "the scope of [these terms] with reasonable certainty," rendering them indefinite.  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).  Despite the inventor deliberately choosing to draft claims using these disputed terms, Wapp asks this Court to rewrite the claims during litigation.  "[I]t is well settled that no matter how great the temptations of fairness or policy making, ***courts do not redraft claims***."  *Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1584 (Fed. Cir. 1995).  "Had the patentee, who was responsible for drafting and prosecuting the patent, intended something different, it could have prevented this result through clearer drafting."  *Miken Composites, L.L.C. v. Wilson Sporting Goods Co*., 515 F.3d 1331, 1337 (Fed. Cir. 2008).  The inventor is stuck with the language he chose, even if it renders the claims indefinite.

## II.     THE ASSERTED PATENTS

This Court addressed the background of the asserted patents in prior *Markman* orders. This brief analyzes the relevant portions of the patents in the context of the disputed terms.

## III.    LEGAL STANDARDS

Given this Court's extensive experience with clam construction, the applicable legal principles are discussed in the context of the disputed terms.

## IV.    DISPUTED CLAIM LIMITATIONS

### A.     "Emulate" & "Simulate"

The parties dispute the plain and ordinary meaning of the terms "emulate" and "simulate." JPMC recognizes that the Court addressed these terms in prior litigation.  In this case, JPMC provides new evidence and arguments demonstrating that: (i) "emulate" means to "model the hardware of," and (ii) "simulate" means "represent features of."  These constructions—based on the totality of the intrinsic and extrinsic evidence—define each term according to its ordinary meaning.  By contrast, Wapp violates basic claim-construction principles by treating the two different terms as having the same meaning without revealing what it contends that meaning to be.

### 1.     "Emulate" And "Simulate" Have Different Meanings

The threshold issue is whether the terms "emulate" and "simulate" should be construed to have different meanings. "Well-settled claim construction principles govern this dispute. '***Different claim terms are presumed to have different meanings***.'" *Apple Inc. v. Omni MedSci, Inc.*, 2024 WL 3084509, at *3 (Fed. Cir. 2024).  This is especially true where use of two different terms "***in close proximity in the same claim*** gives rise to an inference that a different meaning should be assigned to each." *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004).

That is the precisely the case here.  For example, asserted claim 26 of the '811 patent

separately recites "emulate" and "simulate" *in the same claim*, and those two terms *appear within 20 words* of each other:

> instructions *simulate* one or more network events that occur when interacting with a wireless network, wherein a user can create scripts to *emulate* actions of real user behavior.

'811 patent, cl. 26.  The plain text of the claim demonstrates that "emulate" and "simulate" are different terms with different meanings.  Had the inventor wanted the terms to have the same meaning, he could have easily recited "~~simulate~~ emulate one or more network events."  Instead, the inventor deliberately drafted the claim to recite "simulate one or more network events"  Likewise, if the inventor desired to recite "~~emulate~~ simulate actions of real user behavior," he could have done so given his use of "simulate" just few words earlier.  The inventor, however, purposefully drafted the claim to recite "emulate actions."  Simply put, "[h]ad the patentee, who was responsible for drafting and prosecuting the patent, intended something different, it could have prevented this result through clearer drafting."  *Miken*, 515 F.3d at 1337.  This same analysis contradicts Wapp's arguments about claim 1 of the '192 patent.  Dkt. 64 at 12.

Wapp also errs with respect to claims 9-11 of the '864 patent.  Dkt. 64 at 13-14.  Wapp assigns the same meaning to the phrases "real users" and "real user behavior."  Again, these "[d]ifferent claim terms are presumed to have different meanings."  *Bd. Of Regents of the Univ. of Tex. v. BENQ Am. Corp.*, 533 F.3d 1362, 1371 (Fed. Cir. 2008) (assigning different meanings to "each pre-programmed code" and "the matched one or more pre-programmed codes").  Skilled artisans would have understood that claim 9 does not use the word "emulate," because its focus is defining what a virtual user is—something that represents the presence of a real users—not what a virtual user does. Ex. H at ¶ 110.  In contrast, claims 10 and 11 focus on what a virtual user does in the context of the testing process.  *Id.* at ¶ 111.  The claims' explicit usage of two different

terms—"simulate" and "emulate"—with respect to two different objects—"real users" and "real user behavior"—refutes Wapp's contention. The choice to use "simulate" in claim 9 as opposed to "emulate" in claims depending from claim 9 confirms that these terms have different meanings.

Presented with these circumstances, Federal Circuit "precedent instructs that different claim terms are presumed to have different meanings. Had [the inventor] simply wanted to claim [simulate instead of emulate, or vice-versa], it could have done so." *Amgen Inc. v. Sandoz Inc*., 923 F.3d 1023, 1031-32 (Fed. Cir. 2019) (rejecting construction that would "collapse the claim's textual distinction" between two terms). If "the inventor meant [a specific word], he could have used that word. However, ***we must consider the word that the inventor actually chose***." *Int'l Rectifier Corp. v. IXYS Corp*., 361 F.3d 1363, 1374 (Fed. Cir 2004).

None of Wapp's arguments overcome the "presumption that different terms have different meanings." *Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1369 (Fed. Cir. 2012). <u>First</u>, Wapp ignores its prior representation to this Court that "emulate" and "simulate" are used differently. As Wapp itself recognized, the "claims and specification generally use the term 'emulate' to refer to a 'mobile device' and the term 'simulate' to refer to 'network characteristics.'" Ex. A at 3.

<u>Second</u>, Wapp wrongly suggests that JPMC is somehow bound by the Court's earlier construction. Dkt. 64 at 10-13. Where, as here, "defendants have had no chance to litigate their claims, the application of *stare decisis* in the form of an adoption of claim construed without [d]efendants' participation could cause an injustice of precisely the sort that due process seeks to avoid." *Tex. Instruments, Inc. v. Linear Techs. Corp.*, 182 F. Supp. 2d 580, 590 (E.D. Tex. 2002). Contrary to Wapp's assertion, JPMC does not "mirror the prior defendants' arguments." Dkt. 64 at 11. As explained below, JPMC provides new evidence, arguments, and constructions not

previously addressed by this Court.  Accordingly, courts should "conduct[] an independent evaluation during claim construction proceedings." *Imperium IP Holdings, Ltd. v. Samsung Elecs. Co.*, 2015 WL 3761904 at *3 (E.D. Tex. 2015).

     *Third*, relying on its expert, Wapp contends that because certain claims recite both "emulate" and "simulate," the terms are "interchangeable."  Dkt. 64 at 12-13.  Far from overcoming the controlling presumption, Wapp's argument "***turns the presumption of different meanings on its head***.  It was within the patentee's power to draft claims" that recited only "simulate" or "emulate," but it "did not do so." *Apple*, 2024 WL 3084509, at *4.  And Wapp's argument premised on some claims using parallel language to recite "emulating network characteristic" while others recite "simulating network characteristics" is equally erroneous. Rejecting such arguments, the Federal Circuit explains "[t]he fact that the two adjacent claims use different terms in parallel settings ***supports the district court's conclusion that the two terms were not meant*** to have the same meaning." *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc*., 672 F.3d 1335, 1349 (Fed. Cir. 2012).

     **2.**     **Intrinsic And Extrinsic Evidence Establish That "Emulate" Means "Model The Hardware"**

| CLAIMS | JPMC'S CONSTRUCTION | WAPP'S CONSTRUCTION |
|---|---|---|
| **'192** (cls. 1, 60); **'811** (cl. 26) | "model the hardware [of]" | Plain meaning |

     ***The Claim Language—Consistent With Contemporaneous Dictionary Definitions— Uses "Emulate" To Mean Model The Hardware.***  The "claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc).  Here, asserted claim 60 of the '192 patent specifically recites "***emulate*** … a plurality of ***hardware characteristics*** indicative of performance of the mobile ***device***." '192 patent, cl. 60.  Numerous unasserted claims

consistently use "emulate" in the same manner by referring to modeling hardware characteristics. *Id.*, cls. 17, 35, 40 (reciting "***emulate*** … a plurality of ***hardware characteristics***").

The same holds true for "emulate" in asserted claim 26 of the '811 patent, which recites "a user can create scripts to emulate actions of real user behavior to determine the performance of the application, or the network, or both." '811 patent, cl. 26. This language specifically associates emulating "real user behavior" with the mobile device responding to scripted actions. Ex. H at ¶ 96. As Dr. van der Weide explains, a "script" cannot emulate a human pushing a button on a mobile device; rather, the script provides a model for emulating how the device's hardware would respond to that button being pushed. *Id.* The surrounding claim language reinforces JPMC's construction because "performance of the application, or the network, or both" would be affected by how the mobile device's hardware responds to scripted actions, not the human user's physical actions. *Id.* The claim language thus uses "emulate" consistent with the term's ordinary meaning: "model the hardware."

Contemporaneous technical dictionaries confirm this understanding. The IBM Dictionary of Computing defines "emulate" as "***imitat[ing]*** one system with another, ***primarily by hardware***, so that the imitating system accepts the same data, executes the same programs, and achieves the same results as the imitated system." Ex. B at JPMC-00166573. Similarly, the IEEE Dictionary defines "emulation" in the field of software as "***imitati[ng]*** of all or part of one computer system by another, ***primarily by hardware***, so that the imitating computer system accepts the same data, executes the same programs, and achieves the same results as the imitated system." Ex. C at JPMC-0166581. Indeed, Wapp's own dictionary definitions make clear that "emulate" involves modeling something deeper than the surface features of the target system, namely, the system's hardware. Ex. H at ¶ 102.

6

***The Specification Further Supports That "Emulate" Means "Model The Hardware."***
"The only meaning that matters in claim construction is the meaning in the context of the patent." *Columbia Univ.*, 811 F.3d at 1363. When determining a term's ordinary meaning, the Federal Circuit "explain[s] that a patent's express purpose of the invention informs the proper construction." *Sequoia Tech., LLC v. Dell, Inc.*, 66 F.4th 1317, 1326 (Fed. Cir. 2023).

Here, the inventor sought to address the problem that mobile applications may work differently on different types of devices. '192 patent, 1:44-46.[2] For example, a mobile application may run differently on Nokia 6600 and Nokia 7610 devices because of different hardware resources. *Id.*, 1:47-51. To address this issue, the asserted patents explain that an "***emulator includes model*** algorithms" based on hardware characteristics such as the "[p]rocessor," "[s]torage," "RAM," and "[d]isplay." *Id.* at 5:49-54, 5:61-6:13. Emulating these hardware characteristics provides modeled hardware components such as a "modeled display," "modeled processor," "modeled input keys," "modeled memory," and "modeled non-volatile storage." *Id.*, 7:41-53, Fig. 2. The specification further describes selecting from one or more target mobile devices to define the hardware modeled by the emulator. *Id.*, 6:42-44. Based on the intrinsic evidence, skilled artisans would understand the term "emulate" as referring to modeling hardware. Ex. H at ¶¶ 87-88, 91, 95.

***The Prosecution History Confirms JPMC's Construction.*** During prosecution of the '192 patent, issued claim 1 (numbered claim 44 during prosecution) originally recited "emulate … a plurality of ***hardware characteristics***." Ex. D at 8. After the PTO's notice of allowance, the inventor amended the claim to recite "emulate … a plurality of ***network characteristics***." *Id.* As

---

[2] For convenience, JPMC cites to the '192 patent as representative. The '192 patent is a continuation of the '910 patent (Ex. I), which is incorporated by reference into the asserted patents.

Wapp previously told this Court, "emulate" only remains in this claim due to an "editing error." Ex. A at 3.[3]  According to Wapp itself, claim 1 "should recite the term 'simulate' to refer to 'network characteristics.'"  *Id.*  Wapp's new, inconsistent position regarding the prosecution history is simply Wapp arguing against itself.  Dkt. 64 at 13.

### 3.    The Intrinsic and Extrinsic Evidence Establish That "Simulate" Means "Represent Features Of"

| CLAIMS | JPMC'S CONSTRUCTION | WAPP'S CONSTRUCTION |
|---|---|---|
| **'192** (cls. 1, 3, 12-13);<br>**'864** (cl. 1);<br>**'678** (cls. 1, 3, 12-13);<br>**'811** (cls. 1, 8, 22, 24);<br>**'579** (cls. 19-20, 33) | "represent features of";<br>different than emulate | "emulate" |

The claim language and specification show that the asserted patents use the term "simulate" according to its ordinary meaning of "represent features of."  <u>First</u>, the claims in the '192, '864, and '678 patents consistently use "simulate" to refer to "network characteristics," ('864 patent, cl. 1; '678 patent, cl. 1), or "a network connection state," ('192 patent, cl. 1).  This language specifically describes the process of representing network features.  Ex. H at ¶ 120.

<u>Second</u>, the specification describes using a "simulator" to simulate network characteristics. '192 patent, 12:3-13.  The specification also describes "simulating" the application, which means playing the application on an emulated device model in a simulated network environment.  *Id.*, 10:30-39; Ex. H at ¶ 117.  These disclosures demonstrate that the patents use "simulate" (and its other forms) to mean "represent features of" (*e.g.*, features of a network).  Ex. H at ¶¶ 118-20.

<u>Finally</u>, contemporaneous technical dictionaries confirm JPMC's construction.  The IBM Dictionary defines "simulate" as "***[t]o represent certain features of*** the behavior of a physical or abstract system by the behavior of another system…."  Ex. B at JPMC-00166574.  Equally

---

[3]  The same logic applies to recitation of "emulate network characteristics" in dependent claim 16.

important, the IBM Dictionary expressly notes that the definition of "simulate' stands in **"[c]ontrast with** emulate." *Id.* Similarly, the IEEE Dictionary defines "simulation" as "[t]he **representation of selected characteristics of the behavior** of one physical or abstract system by another system." Ex. C at JPMC-00166582. These definitions reflect that skilled artisans understand that "simulate" means representing features. Ex. H at ¶ 123.

### 4.    Wapp's Remaining Arguments Are Without Merit

Rather than set forth an actual construction, Wapp's lead argument cites the *Thorner* decision to criticize JPMC's constructions. Dkt. 64 at 11. Wapp's reliance on *Thorner* is irrelevant because JPMC does not argue for a disclaimer or disavowal. Rather, JPMC construes "emulate" and "simulate" according to their ordinary meanings. By contrast, Wapp's failure to provide any construction is legal error given the parties' dispute about the scope of the ordinary meaning. "When the parties dispute the scope of a claim term, it is the court's duty to resolve it." *Micro Focus* Order at 5 (quoting *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008)). Just as this Court construed the term "configured" in the same asserted patents because the term's meaning "may be lost on the jury absent a construction," *id.* at 36-38, the same holds true for "simulate" and "emulate."

Wapp also argues that because the emulator can "simulate" and some embodiments show a simulator as present within the emulator, the two terms are interchangeable. Dkt. 64 at 14-15. That is wrong. A component's capability to perform multiple functions in no way indicates that all of those functions are synonymous. For example, the emulator also includes a "profiler 106" and profiles an application. '192 patent, 7:7-11, 27-28. This does not mean that "emulate" means "profile." Similarly, that an emulator can "simulate" does not mean that the verb "emulate" and the verb "simulate" are interchangeable. And while the "emulator" may be capable of simulating, "emulating" (*i.e.,* modeling the hardware of the mobile device) remains the sole purview of the

"emulator."  Ex. H at ¶¶ 105-07.  In the asserted patents, the "simulator" does not "emulate." Rather, in all disclosed embodiments, "emulate" refers to the action modeling the mobile device's hardware.  Skilled artisans understand that the capabilities of the mobile device emulator and the network simulator are distinct.  *Id*.

Wapp further argues that dictionary definitions support that the terms are  interchangeable. Dkt. 64 at 16-17.  But Wapp does not attempt to refute Dr. van der Weide's showing that these definitions support JPMC's constructions of the different terms.  Instead, Wapp falls back on generalized allegations that the definitions are "extremely similar."  *Id*.  This cannot overcome the evidence showing that both parties' definitions support JPMC's constructions.  Ex. H at ¶ 125. Wapp's reliance on the *Wiley* dictionary definition of "simulation" is similarly futile.  Dkt. 64 at 16.  That one of five listed definitions of "simulation" uses the word "emulate" (Dkt. 64, Ex. 10 at 712) does not overcome the inventor's use of the different terms "emulate" and "simulate" for different purposes throughout the asserted patents.

**B.**    **"Application"**

| CLAIMS | JPMC'S CONSTRUCTION | WAPP'S CONSTRUCTION |
|---|---|---|
| **'192** (cls. 1, 60-61, 65); **'864** (cls. 1, 8, 13); **'678** (cls. 1, 21); **'811** (cls. 1-2, 9, 22, 26); **'579** (cls. 15-16, 20) | Frame based application | Plain and ordinary meaning |

The "construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."  *Phillips*, 415 F.3d at 1316.  From start to finish, the asserted patents solely describe systems and methods concerning "frame based applications."  JPMC's construction of "application" to mean "frame based application" is consistent with the inventor's uniform usage of that term.  In contrast, Wapp's construction—divorced from the intrinsic evidence—seeks to cover ***all types*** of applications.

***The Inventor Equated "Application" And "Frame Based Application."*** The inventor repeatedly and deliberately equated "application ***104***" and "frame based application ***104***"— interchangeably using these terms in the same paragraphs and expressly identifying both terms with the same number "***104***." '192 patent, 4:53-65, 4:66-5:4, 5:14-21. Indeed, the inventor referred to the "frame based application ***104***" in 7 instances. *See id.* & Fig. 1. Addressing analogous circumstances, the Federal Circuit held that a "camera unit **14** as consistently defined throughout the specification consists of a camera, optics, and an image processing unit" when "throughout the specification, the camera unit and its components ***are identified using a numbering convention that associates those components with the number 14***. The specification refers to 'camera unit ***14***' and its components as 'camera ***14a***,' 'optics ***14b***,' and 'image processing unit ***14c***.'" *Ironworks Patents. LLC v. Samsung Elecs. Co.*, 798 F. App'x 621, 625-26 (Fed. Cir. 2020).

The understanding that the inventor equated "frame based application 104" and "application 104" is clinched by the Federal Circuit's decision in *Edwards Lifesciences LLC v. Cook Inc.* There, the court held that the terms "graft" and "intraluminal graft" had the same meaning because the specification "states that 'an <u>intraluminal graft</u> as defined above' is carried through a catheter '<u>until the graft</u> extends into the vessel.' ***The interchangeable use of the two terms is akin to a definition equating the two***." 582 F.3d 1322, 1329-30 (Fed. Cir. 2009) (underlined emphasis in original). Here, the asserted patents do the same thing:

- "Profiler 106 monitors playing of ***<u>frame based application 104</u> within model 102 to estimate resource usage <u>of application 104</u>*** and generates a frame based profile data display 110." '192 patent, 4:66-5:1.

- "In one example of operation, ***development tool 112 is used to develop frame based application 104. Application 104 is transferred*** to emulator 101 for playing within mobile device model 102 to estimate resource usage of application 104 when played on mobile device 114." *Id.*, 5:13-17.

The equating of "frame based application 104" and "application 104" is reinforced by additional passages explaining that "a user interacts with the frame based application development tool 112 to author the application 104." *Id.*, 9:51-53, 7:17-20; 5:13-17.

Wapp's argument that the '864 patent recites "an application" in some claims and "a frame based application" in others (Dkt. 64 at 17) further confirms JPMC's construction. In the specific claims on which Wapp relies, the claim language establishes that the scope of "application" is the same as "frame based application." Wapp contrasts the preamble language "emulating an application" of claim 20 with the preamble language "emulating a frame-based application" of claim 31. *Id*. But Wapp ignores that in claim 31, the language "a frame-based application" ***provides antecedent basis*** for "the application" throughout the body of that claim. The same is true of claim 25, which depends from claim 20 and recites "identifying one or more frames of ***a frame-based application*** where resource utilization of ***the application***…." If "application" and "frame-based application" had different scopes, then these claims would lack antecedent basis due to the expanded and indefinite scope of "the application."

***The Asserted Patents Consistently Describe The Claimed Invention As Relating To "Frame Based Applications."*** The patents explain the concept of a "frame based application" with reference to "Flash applications," which are "based upon a ***timeline of frames*** that may include graphical information and action scripts, FS Commands … selected frame rate, etc." '192 patent, 7:60-8:3. The '192 patent specification includes over 80 frame- and Flash-based

12

references.  The asserted patents further explain that the claimed invention describes development of frame based applications, including Flash applications, to be played on a "***Flash Player***." *Id*., 2:63, 3:10-13, 4:55, 5:30-31, 7:54-63, 8:24, 9:20-48.  The Flash Player "***operates upon a time line of frames within application 104 to provide graphical displays.***" *Id.*, 7:60-66.

Highlighting the frame based nature of the applications developed using the claimed invention, the asserted patents rely on a "frame based application development tool 112" (also referred to as a "flash development tool").  *Id.*, 5:5-28.  And the data collected while the Flash Player plays a frame based application is displayed as "frame based profile data*." Id*., 7:16, 8:30. As the inventor explains, "profiled data 152 may also be ***based upon the timeline and frames of application 104*** and displayed (e.g., ***frame based profile data*** 110) as resource utilization related to one or more of: timeline, frames and processing performance of action scripts." *Id.*, 7:66-8:3.

It is this "frame based profile data" that "may be used to identify areas within application 104 where upon playing of application 104 within mobile 114, performance of mobile device 114 would be stressed." *Id*., 7:17-20.  Indeed, it is exclusively through the discrete frames of a frame based application that the asserted patents describe the "monitor[ing] and record[ing], as profiled data 152, resources utilized by application 104." *Id.*, 7:12-14; Ex. H at ¶ 138.  Figure 3 illustrates that presentation of resource utilization and availability occurs on a frame-by-frame basis:  "Where bars 304 rise above capacity line 308 at locations 310, ***resource utilization for indicated frames of application 104 exceed the available [] resources*** of mobile device 114.' " '192 patent, 8:50-53. Equally telling, the asserted patents never disclose mechanisms for profiling data or displaying resource utilization and availability that do not use a frame based application.  *See, e.g.*, *Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1137 (Fed. Cir. 2016) ("The district court's analysis does not involve importing limitations from embodiments described in the specification.  Every

13

embodiment described in the specification has inwardly extended short seals and every section of the specification indicates the importance of inwardly extended short seals.").

The inventor confirms that the claims are expressly directed to frame based applications throughout the asserted patents.  The asserted independent claims of the '192, '864, and '678 patents recite simulation or emulation of certain "characteristics *indicative of performance of the mobile device when executing the application*" and doing so "via one or more *profile display windows*."  The asserted patents exclusively describe profiling as accomplished on a frame-by-frame basis.  '192 patent, 8:43-48; Ex. H at ¶ 143.  And it is the "frame based profile data" that "may be used to identify areas within application 104 where … performance of mobile device 114 would be stressed."  '192 patent, 7:17-20; Ex. H at ¶ 142.  Moreover, the parties agree that "one or more profile display windows" means "one or more windows showing resources of the mobile device that are available to the application."  Ex. E at 2.  This, too, is only described on a frame-by-frame basis.  '192 patent, 8:50-54; Ex. H at ¶ 140-42.  Skilled artisans would have understood that the claimed "application" is a "frame based application."  Ex. H at ¶¶ 136-40, 143-44.

Wapp wrongly asserts that JPMC imports limitations from the specification into the claims. Dkt. 64 at 16.  Wapp rests on a general principle divorced from the specific context of the intrinsic evidence.  But a "claim construction is persuasive, not because it follows a certain rule, but *because it defines terms in the context of the whole patent*."  *Renishaw PLC v. Marposs Societa' Per Azoni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).  The Federal Circuit recognizes that a construction like JPMC's is both proper and required when the specification consistently extolls the virtues of a particular feature and disparages others.  *UltimatePointer, L.L.C. v. Nintendo Co.,* 816 F. 3d 816, 823-24 (Fed. Cir. 2016).

In *UltimatePointer*, the Federal Circuit construed the term "handheld device" as limited to

14

a "direct-pointing device" because the specification repeatedly emphasized use of a direct-pointing system and disparaged indirect pointing. *Id.* at 819, 823-24. The court explained that "the repeated description of the invention as a direct-pointing system, the repeated extolling of the virtues of direct pointing clearly point to the conclusion that" the handheld device is limited to a direct-pointing device. *Id.* at 823. As in *UltimatePointer*, the asserted patents repeatedly reference frame based applications and components that require a frame based application such as the frame based Flash Player[4] (*e.g.*, '192 patent, 2:63, 3:10-13, 4:53-66, 5:15-31, 7:12, 7:54-63, 8:24, 9:20-48), "frame based" profiling and "frame based" displays (*id.*, 5:1-7, 7:15-16, 8:1, 8:30-40, 9:44, 11:16), and even a "frame based application development tool" (*id.*, 5:5-7, 9:51-52); Ex. H at ¶¶ 132, 149. Just as the *UltimatePointer* patent espoused the benefits of direct pointing, the asserted patents here extoll frame based applications as essential to the invention.

Also, like the *UltimatePointer* patent disparaged indirect-pointing, the provisional application, to which Wapp claims priority, disparages non-frame alternatives in favor of frame based applications:

- "One of the greatest assets the Flash Lite developer has is the active timeline within Flash. ***Unlike other mobile languages like Java, .NET and BREW***, the Flash Lite timeline has the potential to 'visually' represent the mobile application ***frame by frame*** at runtime." Dkt. 64, Ex. 12 at 1.

---

[4] The '864 and '579 patents introduced new matter by generically referring to "Flash Player" as "Player" or "application player." These patents incorporate the '910 patent by reference, which is a parent to and incorporated by reference in the '192, '678, and '811 patents. The '864 and '579 patents also contain a single sentence referencing an application that is "non-frame based." '864 patent, 8:13-14. Importantly, this sentence does not appear in the '192, '678, and '811 patents, which confirms that "application" means "frame based application" as of Wapp's asserted priority date. Disclosures constituting new matter should not be used to construe claim terms appearing in patents not incorporating this new matter. *Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1167-68 (Fed. Cir. 2004).

- "[T]he main platforms for mobile content today, namely ***Java, .NET and BREW suffer from many of the same limitations as VHS does due to their static timeline language***. One the mobile phone the consumer cannot 'customize their experience' nor their interaction with live content via the language timelines." *Id.* at App'x II.

- "***The platform to overcome this problem is the Flash Lite platform*** from Macromedia. With the Kiwi Architecture, consumers can 'jump' to any digital frame of the application timeline ...." *Id*.

As in *UltimatePointer*, the "repeated description" of frame based applications, the "repeated extolling of the virtues" of frame based applications, and the "repeated criticisms" of non-frame based applications "clearly point" to the conclusion that "application," as used in the asserted patents, means "frame based application."

Wapp wrongly asserts that the asserted patents' reference to Java, .NET, and BREW disclose platforms "that could be used to develop mobile applications that are not 'frame-based.'" Dkt. 64 at 18. The asserted patents do not discuss these platforms in connection with any embodiments or any description of the invention. Instead, the inventor referenced these platforms to describe the state of the art and distinguished them from the claimed invention. '192 patent, 3:40-41 ("Early frontrunners like Java, .NET and BREW have taken great strides ***in the early/formative years***."), 3:44-48 ("[A] market primarily based on the Java and J2ME platform ... achieved less than 3% of the total mobile service revenue and less than 19% of non-voice revenue. ***Is this a failure?***")). The '101 provisional likens these platforms to "VHS" as compared to "DVD" (frame based applications). Dkt. 64, Ex. 12. at App'x II. Comparison to an obsolete technology is not "praise," it is the opposite.

### C.    Preamble: "System for [testing/developing] an application for a mobile device"

| CLAIMS | JPMC'S CONSTRUCTION | WAPP'S CONSTRUCTION |
|---|---|---|
| '192 (cl. 1); '864 (cl. 1); '678 (cl. 1) | Not limiting | The preamble is limiting; plain meaning |

The parties dispute whether the preambles for independent claim 1 in the '192, '864, and '678 patents are limiting.  "Generally, a preamble is not limiting."  *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1292 (Fed. Cir. 2015).  Wapp fails to carry its burden of overcoming this presumption.

"A preamble is not limiting where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *Acceleration Bay, LLC v. Activision Blizzard Inc.*, 908 F.3d 765, 770 (Fed. Cir. 2018).  That is the case here.  The claim preambles explicitly recite "[a] system" having an identified use—"testing an application for a mobile device" or "developing an application for a mobile device"—where the claimed system "comprises" software "configured to" perform various functions.  The bodies of the claims then recite limitations on how the software is configured.  Nothing in the preamble language relates to or limits the configuration of the claimed software.  The preambles merely identify an intended use for the system.

Contending that the preambles are limiting, Wapp raises two erroneous arguments.  First, Wapp asserts that the preambles supply antecedent basis.  But courts routinely hold preambles are not limiting even when part of the preamble provides antecedent basis.  *E.g.*, *Visible Connections, LLC v. Zoho Corp.*, 418 F. Supp. 3d 155, 161 (W.D. Tex. 2019) (preamble not limiting despite providing antecedent basis because "deletion of the preamble would not affect the structure or steps of the claimed invention").  Here, nothing in the preamble language limits the configuration of the software.  *See Panasonic Corp. v. Magna Int'l Inc.*, 2022 WL 625089, at *18 (W.D. Tex.

Mar. 3, 2022) ("[T]he introductory use of the term 'camera [sensor/module]' in the preambles does not make the preamble a limitation."). Wapp's reliance on *Eaton Corp. v. Rockwell Int'l Corp.*, is unavailing. In *Eaton*, the "limitations in the body of the claim rel[ied] upon *and* derive[d] antecedent basis from the preamble." 323 F.3d 1332, 1339 (Fed. Cir. 2003). Those circumstances are absent from this case. Here, the preamble language is duplicative because the language after the "configured to" phrase recites the specific "testing" and "developing" functions. Thus, the preambles are "reasonably susceptible to being construed to be merely duplicative of limitations in the body of the claim." *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1324 (Fed. Cir. 2015).

<u>Second</u>, Wapp argues that the preambles are limiting because they "recite essential structure." Dkt. 64 at 21. But Wapp merely points to "system for developing" and "system for testing" and makes the conclusory assertion that these are examples of essential "structural" limitations. *Id*. Wapp does the same for "an application *for* a mobile device." *Id*. All these phrases recite only an intended use of the claimed system. Nothing in these phrases relates to the claimed configuration of software. To the extent Wapp argues that the word "system" provides essential structure, Wapp previously admitted that the "claims recite[] a software system comprised entirely of software elements." Ex. G at 65. "Software," by its very nature, is not structural. *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 438 (2007) ("Abstract software code is an idea without physical embodiment.").

Wapp's reliance on the prior litigations is also misplaced. In those cases, the parties did not dispute that the preambles are limiting. *Micro Focus* Order at 10-11; Bank Cases Order at 8.

### D.    Indefinite Terms

#### 1.    "select one or more characteristics"

| CLAIMS | JPMC'S CONSTRUCTION | WAPP'S CONSTRUCTION |
|---|---|---|
| **'579** (cl. 15) | Indefinite | Plain and ordinary meaning |

The phrase "select one or more characteristics associated with a mobile device" in claim 15 of the '579 patent is indefinite because it is not reasonably clear to skilled artisans what characteristics or combinations of characteristics (if any) can be selected.

This Court previously held the term "the selected characteristics" in claim 1 of the '579 patent indefinite for lack of antecedent basis. Bank Cases Order at 37-42. The Court explained that Wapp's inference that "the characteristics of the selected mobile device type are the selected characteristics" lacked persuasive support and was "unclear as to which characteristics are selected." *Id*. at 41. The Court noted the distinction between selecting a device with associated characteristics, and selecting characteristics themselves. *Id.* at 40 ("the 'simulate …' limitation refers to the 'mobile device type' (rather than the 'characteristics') as being 'selected'"). Lastly, the Court thus reasoned that if Wapp's proposed inference was intended to refer "to all characteristics, [it] is unclear as what 'all' characteristics would mean in this context." *Id*. at 41.

The Court's reasoning is both instructive and decisive here. Wapp confuses selecting a mobile device type with selecting "characteristics associated with a mobile device." Dkt. 64, 31-32. Indeed, Wapp explicitly cites to an embodiment where a ***user selects a mobile device*** and asks the Court to ***infer that this represents selecting characteristics*** associated with that device. *Id.*, 32. This is the same inference the Court previously rejected. Bank Cases Order at 41. Selecting characteristics is not the same as selecting mobile device type, and skilled artisans would not understand them as such. Ex. H at ¶ 189. The scope of "select one or more characteristics" is therefore unclear as to "*which* characteristics [may be] selected." Bank Cases Order at 38, 41.

Well-settled claim construction principles confirm the limitation is indefinite. A court "must give meaning to all the words in [the] claims." *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1557 (Fed. Cir. 1995). Claim 1 of the '579 patent recites: "display a list of one or

more *mobile device types* from which a user can select." Claim 15, however, recites "select one or more *characteristics* associated with a mobile device type." This distinction confirms that "select one or more characteristics associated with a mobile device type" cannot mean "selecting a mobile device with associated characteristics," as Wapp urges. Different limitations "are presumed to have different meanings." *BENQ*, 533 F.3d at 1371.

The analysis of the claim language—including comparison of claims 1 and 15—shows that the "select one or more characteristics" limitation is inconsistent with the specification. As Dr. van der Weide explains, the disclosure does not support selecting "*one or more*" characteristics associated with a mobile device—it only supports selecting a mobile device with associated characteristics. Ex. H at ¶ 190. Given this mismatch, the disclosure of the '579 patent is not reasonably clear as to what characteristics or combinations can be selected. Claim 15 presents the same issue and requires the same outcome as the Court's prior hold regarding claim 1.

### 2. "the physical mobile device"

| CLAIMS | JPMC'S CONSTRUCTION | WAPP'S CONSTRUCTION |
|---|---|---|
| **'579**, cls. 15-16 | Indefinite | Plain meaning |

Claim 15 recites "software instructions … to be run on *a mobile device*" that "initiate transmission of the application on a simulation of *the mobile device*, or to *the physical mobile device* or both." Claim 15 is indefinite because it recites different types of mobile devices but provides no antecedent basis for the claimed "*the* physical mobile device." Absent any antecedent basis, there is no "reasonable certainty … about the scope of the invention." *Nautilus*, 572 U.S. at 901. As a result, skilled artisans are "left to wonder" what is "the physical mobile device." *Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*, 813 F. App'x 522, 526 (Fed. Cir. 2020) (holding claims indefinite for lack of antecedent basis).

Wapp offers various attempts to rewrite claim 15 in the middle of this litigation. None of

its efforts dispel the uncertainty in the claim language.  <u>First</u>, Wapp asserts that the prior recitation of "a mobile device" provides antecedent basis for the later claimed "the physical mobile device." Dkt. 64 at 34.  The claim language defeats Wapp's argument.  Had the inventor intended "a mobile device" to serve as antecedent basis for the phrase "the physical mobile device," at least two options were available to him.  The claim could have been written to recite "a physical mobile device" rather than reciting "a mobile device."  Or the claim could have subsequently recited "the mobile device" rather than introducing the term "the physical mobile device."  The inventor, however, did neither.  Accordingly, "[a]dopting [Wapp's] proposal would require rewriting the claims, but ***it is not [the court's] function to rewrite claims*** to preserve their validity." *Synchronoss Tech., Inc. v. Dropbox, Inc*., 987 F.3d 1358, 1367 (Fed. Cir. 2021).

The inventor's amendments during prosecution further refute Wapp's effort to equate "the mobile device" and "the physical mobile device."  Responding to a PTO rejection, the inventor revised what became claim 15 as follows:

> initiate transmission of the application <u>on a simulation of the mobile device, or to</u> ~~that is being developed to one or more physical versions of~~ the <u>physical</u> mobile device<u>, or both</u>.

Ex. F at JPMC-00006142.  The inventor deleted the phrase "one or more ***physical versions of the mobile device***" and replaced it with the phrase "the ***physical*** mobile device."  If "the mobile device" had the same meaning as "the physical mobile device," then referring to "***physical versions*** of the mobile device" or "***the physical*** mobile device" would have been redundant.  Indeed, the inventor simply could have replaced "physical versions of the mobile device" with "the mobile device."  The inventor did not do so then, and Wapp cannot do so now.  The inventor's amendment makes clear that "the physical mobile device" is different from "the mobile device."

<u>Second</u>, even if "a mobile device" could provide antecedent basis for "the physical mobile

device" (it cannot), Wapp's argument only creates more uncertainty about which of the **two different** recitations of "a mobile device" in claim 15 the "physical mobile device" would refer to. *Compare* '579 patent, 24:58-59 ("for developing an application to run *on **a mobile device***") *with id.,* 24:61-62 ("select one or more characteristics associated with ***a mobile device***"). As the Federal Circuit explains, "if two different levers are recited earlier in the claim, the recitation of 'said lever' in the same or subsequent claim ***would be unclear where it is uncertain which of the two*** levers was intended." *Baldwin Graphic Sys., Inc. v. Siebert, Inc.,* 512 F.3d 1338, 1343 (Fed. Cir. 2008). Wapp's attempt to redraft the claim only sows more confusion into claim 15.

Third, Wapp's contention that a "simulation of the mobile device" is different from both "a mobile device" and the "the physical mobile device" further compounds the uncertainty in claim 15. Dkt. 64 at 34. If "a mobile device" provides antecedent basis for both "the mobile device" and "the physical mobile device," then why would the inventor have used those two different terms in such close proximity? Wapp again contravenes the rule that "different claim terms are presumed to have different meanings." *BENQ*, 533 F.3d at 1371.

Fourth, skilled artisans would not consider either instance of "a mobile device" as the antecedent basis for "the physical mobile device." Ex. H at ¶¶ 239-40. The first instance of "a mobile device"—appearing within the preamble phrase "developing an application to be run on a mobile device"—cannot establish that the claimed "mobile device" is also the "physical mobile device" because the specification explicitly contemplates running an application on an emulated mobile device. '579 patent, 4:14-17. The second instance of "a mobile device"—appearing within the limitation "select one or more characteristics associated with a mobile device"—also does not refer to a "physical mobile device" because skilled artisans would have understood that the characteristics discussed in the '579 patent are tied to mobile device ***types***, not a physical device

22

itself. '579 patent, 6:13-16 (characteristics are "included for each **mobile device type**"). A user "selects one or more **target mobile devices**" that correspond to a particular "mobile device type," such as the NOKIA 3650. *Id.*, 5:35. Accordingly, skilled artisans would understand the claimed selection to be a selection of a mobile device type used to generate an emulated model of that mobile device, not a selection of a "physical mobile device." Ex. H at ¶ 239.

### 3.   "on the mobile device"

| CLAIMS | JPMC'S CONSTRUCTION | WAPP'S CONSTRUCTION |
|---|---|---|
| '192, cl. 60 | Indefinite | Plain and ordinary meaning |

Claim 60 of the '192 patent recites "an application configured to enable a user to modify a photo **on the mobile device**, wherein the application is developed using a software authoring platform configured to simultaneously visually emulate … hardware characteristics indicative of performance of **the mobile device** when executing the application." The phrase "on the mobile device" is indefinite because skilled artisans cannot reasonably ascertain its scope.

To start, claim 60 nowhere recites "on *a* mobile device" or "*a* mobile device" On its face, the claim fails to supply any antecedent basis for "on the mobile device." From the plain language, it is then unclear if the phrase "on the mobile device" limits "a system," or "an application," or "a user," or "a photo," or "to modify." The claim language simply provides no guidance. Even if, as Wapp suggests, "on the mobile device" limits the term "application" (Dkt. 64, Ex. 8 at ¶135), it remains unclear what that specific "the mobile device" is. Wapp contends it is "the mobile device executing the application." Dkt. 64 at 29. But this contention is no better. Could this be *any* mobile device? Any mobile device type? '192 patent, 6:42-44 ("A user … may [] select one or more target mobile devices.") A particular, selected mobile device type? *Id.* A particular physical mobile device? *Id.*, 6:65-7:3 (describing "final testing" after deploying to a mobile device). None of this is identified or clarified.

Compounding this uncertainty, the specification is entirely devoid of any mention—much less discussion—of photo modification or photo editing applications for a mobile device.  Ex. H at ¶ 205.  For this reason, Wapp cannot avoid indefiniteness by simply asserting that the claimed "the mobile device" can be any mobile device mentioned in the specification.  Dkt. 64 at 30.  The patent never mentions a mobile device with an application for modifying photos, and Wapp does not point to any such instance.

Rather than identify any intrinsic evidence that provides clarity to the claim language, Wapp tries to rewrite the claim.  Dkt. 64 at 31 (arguing to change "the mobile device" to "am obile device").  Litigants and "courts *may not redraft claims*, whether to make them operable or to sustain their validity."  *Chef Am. Inc. v. Lamb Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004).  While Wapp identifies examples in the specification where the inventor used "a mobile device" followed by "the mobile device" (Dkt. 64 at 30), that is no license to rewrite claim 60.  In fact, the reverse is true: "Had the inventors intended this limitation ["a mobile device"], they could have drafted the claims to expressly include it."  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 843 (Fed. Cir. 2010).  The failure to do so renders the claim indefinite.

In a similar vein, Wapp cites its expert declaration to assert "that the first instance" of "the mobile device" somehow provides antecedent basis for the "second instance" of that term.  Dkt. 64 at 30.  That argument is legally wrong.  Wapp concedes there is no antecedent basis for the "first instance" of "the mobile device."  And the phrase "on *the* mobile device" cannot provide antecedent basis for "*the* mobile device."  Wapp's brief notably omits the word "the" from the first instance of "*the* mobile device."  *Id.*  Wapp also uses its expert's declaration to contradict the claim language, which is the precise role that expert testimony cannot play.  As long-established precedent directs, "[e]xpert testimony may not be used to vary or contradict the claim language."

*AFG Indus., Inc. v. Cardinal IG Co.*, 239 F.3d 1239, 1249 (Fed. Cir. 2001).

Acknowledging that claim 60 is defective, Wapp tries to explain it away as merely "suboptimal claim drafting." Dkt. 64 at 31. The Federal Circuit rejects such litigation-induced excuses because "patent draftsmanship **is an exacting art**." *Zenon Env'tl, Inc. v. U.S. Filter Corp.*, 506 F.3d 1370, 1382 (Fed. Cir. 2007). Accordingly, "no matter how great the temptations of fairness or policy making, courts do not redraft claims." *Quantum*, 65 F.3d at 1584. As a last resort, Wapp invites this Court to gloss over the defective claim by force of judicial "correction." Dkt. 64 at 31. But reciting "on the mobile device" is not a minor typographical mistake or clerical error. Rather, the lack of antecedent basis is a fatal defect that causing the claim to fail the "definiteness requirement's public-notice function." *Nautilus*, 572 U.S. at 911. "Because the purported error is more than a misspelling or a missing letter, [plaintiff's] request to modify the plain language is inappropriate." *Smartflash LLC v. Apple Inc.*, 77 F. Supp. 3d 535, 561 (E.D. Tex. 2014).

4.    **"network characteristics indicative of performance of the mobile device [when executing the application]"**

| CLAIMS | JPMC'S CONSTRUCTION | WAPP'S CONSTRUCTION |
|---|---|---|
| **'192** (cl. 1); **'864** (cl. 1); **'678** (cl. 1) | Indefinite | Plain and ordinary meaning |

The limitation "network characteristics indicative of performance of the mobile device when executing the applications" recited in claims 1 of the '192, '864, and '678 patents is indefinite. Skilled artisans would not understand how "network characteristics" could indicate performance of a mobile device because "network characteristics" are not related to mobile devices. Ex. H at ¶¶ 148, 150, 151.

The disputed limitation arises from an amendment made during prosecution of the '192 patent, where the inventor changed the claim language after allowance—and without

explanation—from reciting "a plurality of **hardware characteristics** indicative of performance of the mobile device" to "a plurality of **network characteristics** indicative of performance of the mobile device." Ex. D at 8.  As a result, the phrase "indicative of performance of the mobile device" that previously modified "hardware characteristics," now modifies "network characteristics."  On its face, the amendment renders the claims non-sensical and leaves skilled artisans to guess about the scope of this limitation.  Ex. H at ¶ 160.  Wapp itself concedes that the amendment was erroneous.  Ex. A at 3.

Skilled artisans would not understand how "network characteristics" could indicate performance of mobile devices because mobile devices do not have "network characteristics."  Ex. H ¶ 151.  And the specification offers no guidance, much less disclosure, about how "network characteristics" would possibly indicate the performance of mobile devices.  *Id*. at ¶¶ 151, 163.  The Federal Circuit's decision in *Columbia University* is instructive.  811 F.3d at 1367.  There, the court held claims indefinite because "the claims describe the step of extracting machine code instructions **from something that does not have** machine code instructions."  *Id*.  Similarly it is non-sensical to claim that "network characteristics" indicate mobile device performance when mobile devices **do not have network characteristics**.  Here, as in *Columbia University*, the "claims are nonsensical in the way a claim to extracting orange juice from apples would be, and are thus indefinite."  *Id.*

The specification confirms the lack of certainty regarding this limitation.  The specification nowhere describes mobile devices as having "network characteristics."  Instead, the specification exclusively describes "network characteristics" as "scripted events, (e.g., cell tower identification, service message, bandwidth, etc.), consumer events (e.g., checking email, checking messages, browsing network, available minutes, selecting images, etc.) and incoming events (e.g., phone

calls, WAP Messages, receiving MMS, receiving SMS, etc.)." '192 patent, 12:5-10. The specification makes clear that all of these "network characteristics" concern **events external** to the mobile device. These events are inputs to the mobile device's processing hardware; they are not characteristics or indicators of the mobile device's performance. Ex. H at ¶ 151.

Wapp's arguments confirm this distinction. Wapp asserts the specification "describe[s] a specific example of an embodiment in which the user selects the 'send message' network characteristic 'to evaluate the performance of application 104 while a message is received from the network.'" Dkt. 64, Ex. 8 at ¶ 113; Dkt. 64 at 28. This cited disclosure relates to a user interface with a selection of network characteristics in one window pane and a frame based profile data display in another window pane. '192 patent, Fig. 12. Skilled artisans would understand that performance evaluation is accomplished via the frame based profile data display that uses "mobile device characteristics" not "network characteristics" to indicate stress on the mobile device. Ex. H at ¶¶ 156-57; '192 patent, 6:11-13 ("Mobile Device Characteristics … may be used to specify performance of model 102 to emulate mobile device 114."), 7:16-20 ("[F]rame based profile data 110 may be used to identify areas within application 104 where upon playing of application 104 within mobile device 114, performance of the mobile device 114 would be stressed.").

Wapp's remaining arguments are equally misguided. Wapp contends that the limitation is not indefinite because the individual terms "network characteristics" and "indicative of" have ordinary meanings. Dkt. 64 at 37. That, however, does nothing to blunt the fact that the combination of those separate terms into one phrase results in a non-sensical limitation. "We are unpersuaded that the ordinary meanings of the constituent words alone are enough in the context of this case to establish what these phrases mean," rendering the claims indefinite. *TVnGO Ltd. v. LG Elecs. Inc.,* 861 F. App'x 453, 458 (Fed. Cir. 2021).

Next, Wapp contends that the claims are definite because they recite "performance of the mobile device when ***executing the application***." Dkt. 64 at 27-28 (Wapp's emphasis). But Wapp omits the first portion of the limitation reciting "network characteristics indicative of." Wapp fails to explain how "network characteristics" relate in any way to ***the device's performance*** while executing an application on a mobile device. Wapp also argues that skilled artisans would understand that receiving a message is a "network characteristic indicative of performance of the mobile device." Dkt. 64 at 28. But claim 12 of the '192 patent defeats this argument. Claim 12 recites "allow[ing] a user to simulate an incoming sms message." This claim does not further limit "network characteristics indicative of performance of the mobile device" to require simulating an incoming sms message. Rather, the claim recognizes that simulating reception of a message is an independent function of the software.

Finally, Wapp argues that the "at least bandwidth availability" language saves claim 1 of the '678 patent from indefiniteness. Dkt. 64 at 27. It does not. Like the rest of the limitation, this additional language does not provide any clarity about how a "network characteristic" relates to mobile device performance, and nothing in the specification describes how this specific "network characteristic," unlike others, is indicative of such performance.[5] Ex. H at ¶ 169.

### 5. "the connection simulation"

| CLAIMS | JPMC'S CONSTRUCTION | WAPP'S CONSTRUCTION |
|---|---|---|
| '192, cls. 4-7 | Indefinite | Plain and ordinary meaning |

The limitation "the connection simulation" in claims 4-7 of the '192 patent is indefinite. Dependent claim 4 recites "wherein ***the connection simulation*** includes one or more profiles."

---

[5] Wapp mistakenly asserts waiver. Dkt 64 at 27, n.6. JPMC has always asserted that the entire limitation is indefinite, and Dr. van der Weide explained why the "bandwidth availability" language cannot save the claim.

Claim 4 depends from claim 2, which recites "enable a user **to select** from **one or more connection simulations**."  This claim language demonstrates that "the connection simulation" in claim 4 lacks any explicit antecedent basis because claim 2 recites a generic set of "one or more connection simulations."  The limitation also lacks any implicit antecedent basis.  At best, skilled artisans would understand that "**the** connection simulation" could be one of the any "one or more connection simulations" in claim 2, but the claims provide no guidance as to which one.  Ex. H at ¶ 213.  Claim 2 underscores the conclusion of indefiniteness by requiring "a user to select" one or more connection simulations.  Accordingly, claim 4 necessarily refers to a specifically selected "connection simulation" rather than the "**all of** one or more simulations," per Wapp's attempted redraft of the claims.  Dkt. 64 at 23.

Wapp contends that the use of "the connection simulation" in claim 4 "simply reinvokes that same 'one or more' meaning."  *Id*.  This argument, however, ignores the plain meaning of both the definite article "the" and of the plurality of "one or more."  The argument also ignores dependent claims 8 and 9 that recite "***the one or more*** connection simulations" when referring back to claim 2.  The inventor's explicit use of the language "one or more connection simulations" in claims 8 and 9 confirms that claim 4, which does not employ such language, cannot limit the "one or more connection simulations" collectively.  Ex. H at ¶ 216.  And the inventor's repeated use of "one or more connection simulations" establishes that he knew how to use that phrase and chose not to do so in claim 4.  "Plainly, then, had the inventors desired [to use particular word], they could easily have included the word [] in the claim language.  In the absence of their decision to do so, however, we **will not take it upon ourselves to rewrite the claim** in that way." *Takeda Pharm. Co. v. Zydus Pharms. Inc.*, 743 F.3d 1359, 1365 (Fed. Cir. 2014).

### 6. "the monitored resource"

| CLAIMS | JPMC'S CONSTRUCTION | WAPP'S CONSTRUCTION |
|---|---|---|
| **'579** (cls. 15, 27) | Indefinite | Plain meaning |

The term "the monitored resource" in claims 15 of the '579 patent is indefinite. Claim 15 recites "display a representation of one or more of the monitored resources," but the claim does not recite a monitored resource from which "the monitored resource" could reasonably depend.

Wapp's argument that "the monitored resource" refers back to a plural term "one or more resources" recited in claim 15, Dkt. 64 at 24, is flawed for the same reasons explained above for "the connection simulation." The limitation "***monitor utilization of one or more resources** of the mobile device … by an application*" does not specify which of the "one or more resources" is a monitored resource. Indeed, this language recites monitoring ***utilization*** not monitoring ***resources***—those are different things.

The specification fails to supply any clarity. As with the claim language, Wapp's citations to the specification all relate to displaying "resource utilization" not displaying a monitored resource itself. Dkt. 64 at 24-25. There is no indication anywhere in the specification which "resource" is "the monitored resource" recited in claim 15. "The monitored resource" therefore fails to inform skilled artisans about the scope of the invention with reasonable certainty.

## V. <u>CONCLUSION</u>

JPMC respectfully requests that the Court adopt JPMC's proposed constructions.

Dated:  October 8, 2024

Respectfully submitted,

By: */s/ Blaney Harper*
    Rita J. Yoon
    (Illinois Bar. No. 6298019)
    JONES DAY
    555 California Street, 26th Floor
    San Francisco, CA 94104
    Telephone: (415) 626-3939
    Facsimile: (415) 875-5700
    ryoon@jonesday.com

    Blaney Harper
    (Texas State Bar No. 24142213)
    JONES DAY
    2727 North Harwood Street, Suite 500
    Dallas, Texas  75201
    Telephone: (214) 220-3939
    Facsimile: (214) 969-5100
    bharper@jonesday.com

    I. Sasha Mayergoyz
    (Illinois Bar No. 6271800)
    JONES DAY
    110 N. Wacker Dr., Suite 4800
    Chicago, IL 60606
    Telephone: (312) 782-3939
    Facsimile: (312) 782-8585
    smayergoyz@jonesday.com

    Yury Kalish (*pro hac vice*)
    (Virginia Bar No. 87680)
    R. Levent Herguner (*pro hac vice*)
    (New York Bar No. 5722228)
    JONES DAY
    51 Louisiana Avenue, N.W.
    Washington, D.C. 20001
    Telephone: (202) 879-3939
    Facsimile: (202) 626-1700
    ykalish@jonesday.com
    rlherguner@jonesday.com

    Hannah Mehrle (*pro hac vice*)
    (Ohio Bar No. 100228)
    JONES DAY
    North Point

901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
hmehrle@jonesday.com

Walter Mostowy (*pro hac vice*)
(California Bar No. 341454)
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
Telephone: (650) 739-3939
Facsimile: (650) 729-3900
wmostowy@jonesday.com

Stephen M. Bradley (*pro hac vice*)
(Georgia Bar No. 178489)
JONES DAY
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
Telephone: (404) 521-3939
Facsimile: (404) 521-8330
sbradley@jonesday.com

Zachary Marshall-Carter (*pro hac vice*)
(New York Bar No. 6094072)
JONES DAY
New York, NY 10281
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
zmarshallcarter@jonesday.com

**ATTORNEYS FOR DEFENDANT
JPMORGAN CHASE BANK, N.A.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served on Plaintiffs through their respective counsel of record via e-mail on October 8, 2024.


*/s/ Blaney Harper*
Blaney Harper